**READING INDUSTRIES, INC., et al.,
Plaintiffs,**

v.

**KENNECOTT COPPER CORPORA-
TION et al., Defendants.**

**TRIANGLE INDUSTRIES, INC., et al.,
Plaintiffs,**

v.

**KENNECOTT COPPER CORPORA-
TION et al., Defendants.**

**Nos. 71 Civ. 1736, 71 Civ. 1737.**

United States District Court,
S. D. New York.

Jan. 23, 1974.

Harold E. Kohn, P. A., Philadelphia, Pa., for plaintiffs.

Morton Peyser, New York City, for Triangle plaintiffs.

Alexander & Green, New York City, for defendant Cerro Corp.

Sullivan & Cromwell, New York City, for defendants Kennecott Copper Corp. and Chase Brass & Copper Co., Inc.

Covington & Burling, Washington, D. C., for defendant American Smelting & Refining Co.

Debevoise, Plimpton, Lyons & Gates, New York City, for defendant Phelps Dodge Corp. and Phelps Dodge Industries, Inc. (successor in interest to the other named Phelps Dodge defendants).

Chadbourne, Parke, Whiteside & Wolff, New York City, for defendants The Anaconda Co., Anaconda American Brass Co. and Anaconda Wire and Cable Co.

LASKER, District Judge.

These companion actions are brought by several fabricators of copper products against five copper producers (the principal defendants) and some of their subsidiaries (fabricators producing certain products which compete with products manufactured by plaintiffs). The complaints in the two actions are similar, and for purposes of the present motions will be referred to collectively. The extensive complaint is divided into three counts. Count I charges that defendants, since at least 1964, have conspired to attempt to monopolize, and monopolized, the production and sale of copper and myriad (but unspecified) fabricated copper products, in violation of the Sherman Act, 15 U.S.C. §§ 1 and 2.· Count II alleges, with regard to each principal defendant, that its acquisitions of fabricating facilities violates § 7 of the Clayton Act, 15 U.S.C. § 18. Count III alleges that since at least 1964 defendants have unlawfully discriminated as to price in the sale of fabricated copper products in violation of the Robinson-Patman Act, 15 U.S.C. § 13.

Defendants, by parallel motions, move for a separate and later trial of Count II of the complaint pursuant to Rule 42(b), Federal Rules of Civil Procedure, and to defer discovery on it, reserving determination whether there should be separate trials of the Clayton Act claims against each of the five principal defendants.

## I.

Plaintiffs advance the somewhat circular view that since the complaint treats the Count I and II claims as interrelated, that they must be so considered for purposes of Rule 42(b), and that in any event the elements of proof required by each count are so similar (for example, as to questions of the relevant market and line of commerce) that separate trials would be substantially duplicative.

They rely primarily on Utah Gas Pipe Lines Corp. v. El Paso Natural Gas Co., 233 F.Supp. 955, 962 (D.Utah 1964) for the proposition that Sherman Act and Clayton Act claims generally require similar proof and a unified trial. However that case is distinguishable: it involved many fewer parties, less complex claims, and the court found that as pleaded, the Clayton Act claim was insufficient so the Rule 42(b) motion was moot.

Plaintiffs also cite Reliable Volkswagen Sales and Service Company, Inc. v. Worldwide Automobile Corp., 34 F.R.D. 134, 138–139 (D.New Jersey, 1963) a

treble damage action charging a conspiracy to monopolize the retail sale of Volkswagen automobiles. In *Volkswagen* the court denied a Rule 42(b) motion for separate trial of the issue of the relevant market, holding that the monopoly claims were "inextricably woven" with the question of relevant market. That case also differs from the present case since only Sherman Act claims (none were brought under the Clayton Act) were brought against a single principal defendant (the other defendants were Volkswagen retail dealers) for restraint of trade in a relatively discrete product —Volkswagens and spare parts for them.

Plaintiffs cite no case, and we are aware of none, which in a single trial disposed of multi-defendant Sherman Act conspiracy claims, as well as Clayton Act claims that each defendant *acting alone* illegally acquired other, non-defendant companies.

## II.

■ Rule 42(b) vests discretion in the court to order separate trials of claims ". . . in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy . . .". In Xerox Corp. v. Nashua Corp., et al., 57 F. R.D. 25 (S.D.N.Y.1972) we noted that earlier decisions applying Rule 42(b) stressed the following factors: (1) are the issues sought to be separately tried significantly different from one another? (2) are the issues triable by jury or the court? (3) does the posture of discovery as to the respective issues suggest that they should or should not be tried together? (4) will the separate issues require the testimony of different witnesses and documentary proof? (5) will the party opposing the severance be prejudiced if it is granted? See Components, Inc. v. Western Electric Co., 318 F.Supp. 959, 966ff and cases cited therein (D.C.Me.1970), Metal Film Company v. Metlon Corp., 272 F.Supp. 64

(S.D.N.Y.1967), Transmirra Products Corp. v. Monsanto Chemical Co., 27 F. R.D. 482 (S.D.N.Y.1967).

■ Consideration of similar factors in the present lawsuit indicates that a separate trial of Count II is much the wiser course. Counts I and III relate to the copper production and fabrication markets from about 1964 to 1970 and claim that defendants increased the price of copper, restricted production, and subjected independent fabricators to a "price squeeze," putting them at a comparative disadvantage vis-a-vis the integrated copper company defendants. Count II, the Clayton Act claim, incorporates the allegations of Count I (by Paragraph 30), and alleges that defendants obtained their fabricating subsidiaries, divisions or affiliates "by a series of mergers and acquisitions beginning as early as the 1920's" (Complaint, Count II, Paragraph 32) and that the acquisitions and mergers have been instrumental in enabling defendants to engage in the acts alleged to violate the Sherman Act (Complaint, Paragraph 34). The relief sought includes the award of treble damages, injunctive relief and (as to Count II) multiple divestitures that would, in effect, restructure the copper industry.

Returning to the factors outlined in *Xerox, supra,* it seems clear, first, that the Count II issues are significantly different from those of Counts I and III. Count I alleges a number of overt acts undertaken by defendants acting in concert in the period 1964–70. Count III (the Robinson-Patman claim), though not a conspiracy claim, directly relates to the same alleged pattern of anti-competitive market activity, and apparently reaches back only to 1966, by operation of the statute of limitations.

Count II, however, makes the significantly different claims that each of the principal defendants obtained its fabricating subsidiaries or affiliates by a series of mergers beginning as early as the 1920's, whose effect was substantial-

ly to lessen competition in the production and sale of copper and various fabricated copper products. While we agree with plaintiffs that adjudication of all three counts requires determination of the relevant markets—a complex enterprise even as to a single claim—it is obvious that the relevant markets for the Clayton Act claims which relate to periods reaching back into the 1920's, may be very different from the relevant market for purposes of Counts I and III relating to the period 1964–70. Matters are further complicated by the fact that each of plaintiffs and defendants has, at different times, manufactured a given range of products (for example, plumbing tubes, commercial tubes, sheet and strip brass rods, communication wire and cable, magnet wire, power wire and cable, etc.) many of which might not compete with one another or are not functionally interchangeable for purposes of market definition. See Brown Shoe Co. v. United States, 370 U.S. 294, 324–325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 593–595, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1956). Indeed, defendants' papers on this motion indicate that each defendant (by virtue of the variety of its products) may claim participation in a number of markets, all of which will require definition at the trial of Count II.

The fact that plaintiffs have requested a jury trial as to all claims supports our finding that separate trials will aid a fair and orderly disposition of the issues. Judge Metzner's observation in Reines Distributors, Inc. v. Admiral Corp., 257 F.Supp. 619, 621 (S.D.N.Y. 1965), that "[t]he inherent complexity of an antitrust case is itself a factor promoting a separate trial of an issue . . . ." has particular force here, since we can hardly imagine a case more likely to generate confusion in the minds of a jury. To expect a jury to assimilate the economic and historical condition of an entire industry, keeping separate the conspiracy claims from the non-conspiracy claims, bearing in mind the relevant markets for myriad products at different points in time, and to understand what would inevitably be an enormously complex charge at the end of trial is to expect too much. In our view, such a trial would carry with it an inherent likelihood of prejudice.

An equally compelling reason for severance of Count II is the fact that proof of the Count II claims will require the testimony of witnesses and documentary material different from the other counts. This is so not only because of the different time periods and products involved, but also because the Count II claims relating to the particular acquisitions of each defendant will require material largely unrelated to the conspiracy or Robinson-Patman claims and substantially inapplicable to the cases of the other defendants. We note, moreover, that § 7 of the Clayton Act was amended in 1950, so that different legal standards may be applicable as to different acquisitions occurring before and after 1950.

Plaintiffs' final contention that they will be prejudiced by the separate trial of what they claim are integrally related claims is unpersuasive, since the court can, of course, admit such historical background material as is necessary for a proper understanding of the Count I and III issues to be tried first.

## III.

In the light of this disposition, defendants' motion for deferral of discovery on Count II is granted. Discovery to date has related primarily to the period from 1964 to the present, the period of the Count I and III claims. It may represent a great burden upon defendants simultaneously to meet extensive requests for documents relating to fifty years of market and corporate history, which are of limited relevance to Counts I and III. Moreover, in view of the possibility that plaintiffs' recovery of damages for the 1966–70 period will ren-

der unnecessary certain discovery under Count II, we believe that deferral is the most expeditious course. We agree with plaintiffs, however, that discovery of some historical background materials relating to defendants' acquisitions and mergers may be necessary for proper presentation of the issues in Counts I and III. The proper course is, therefore, to stay discovery on Count II except to the extent permitted by determinations of the court based on an offer of proof of the relevance to Counts I and III of any Count II material.

The motion for separate trial of Counts I and III prior to trial of Count II is granted. The motion to defer determination on the question of separate trials on Count II is granted. The motion to defer discovery on Count II is granted to the extent specified in this Memorandum.

It is so ordered.