**UNITED STATES FOOTBALL LEAGUE, et al., Plaintiffs,**

v.

**NATIONAL FOOTBALL LEAGUE, et al., Defendants.**

No. 84 Civ. 7484 (PKL).

United States District Court, S.D. New York.

April 24, 1986.

On Motion to Strike April 24, 1986.

On Motion for Partial Summary Judgment April 24, 1986.

See also, 605 F.Supp. 1448.

Finley, Kumble, Wagner, Heine, Underberg, Manley, Meyerson & Casey, Spengler Carlson Gubar Brodsky & Frischling, New York City, for plaintiffs.

Davis Polk & Wardwell, Skadden, Arps, Slate, Meagher & Flom, New York City, Covington & Burling, Washington, D.C., for defendants.

LEISURE, District Judge:

The United States Football League and certain of its member clubs (collectively referred to as the "USFL"), have sued the National Football League, its commissioner and certain of its member clubs (hereinafter collectively referred to as the "NFL"), to obtain declaratory and injunctive relief and to recover damages resulting from alleged violations of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 & 2, and the common law.

The USFL has moved for partial summary judgment on the basis that the NFL's continuing conduct violates a judicial decree issued in 1953 and construed in 1961. *United States v. National Football League*, 116 F.Supp. 319 (E.D.Pa.1953), *construed*, 196 F.Supp. 445 (E.D.Pa.1961), *order entered*, No. 12808 (E.D.Pa. July 28, 1961). The USFL claims that this decree precludes the NFL from entering into television contracts which tie up more than one network. Summary judgment therefore should be granted in favor of the USFL declaring the NFL's pooled rights television contracts with the American Broadcasting Company ("ABC"), the Columbia Broadcasting System ("CBS"), and the Na-

tional Broadcasting Company ("NBC") to be unlawful and enjoining their further performance. The NFL opposes the motion on the grounds that it has express Congressional sanction in the form of a specific exemption from antitrust laws to enter into pooled rights television contracts with more than one network. For the reasons presented below, the USFL's motion is denied.

### Factual Background
### The NFL Network Contracts

The NFL has entered into pooled rights television contracts with the three nationwide television networks. Each of the NFL contracts with ABC, CBS, and NBC is non-exclusive. None of the three networks is precluded from telecasting USFL games. When the contracts terminate, each of the networks can choose to bid, or not to bid, for the rights to continue to telecast NFL games. Each contract is of limited duration and provides the network with the right of first negotiation and the right of first refusal with respect to contract renewals. Each contract provides the network with exclusive bargaining rights for a prescribed period of time.

### Litigation History

In 1951, the United States sought to enjoin the enforcement of Article X of the NFL's By-Laws which governed the telecasting and broadcasting of outside games into the home territories of other teams. Article X provided, *inter alia*, that no team could broadcast or telecast its games into the "home territory" of another team, whether that team was playing at home or away. The government contended that this By-Law eliminated competition among member clubs in selling the broadcast and telecast rights of their games, thereby restricting the public's access to broadcasts and telecasts of NFL games. After a trial, the Hon. Allan K. Grim, United States District Judge, applied a rule of reason analysis in holding that the restriction on telecasting outside games in home territories when the home teams play away games constituted an unreasonable and illegal restraint of trade. *United States v. National Football League,* 116 F.Supp. at 326, 327 (E.D.Pa.1953). The court enjoined enforcement of Article X to the extent it prohibited "outside" game telecasts in a team's market when the team was playing away. *Id.* at 330. The court also enjoined all territorial restrictions on the sale of radio broadcast rights. Section V of the final judgment in the case provides for, in pertinent part, the following:

> The defendants are jointly and severally ... enjoined ... from directly or indirectly entering into ... any contract, agreement or understanding with the league defendant or any member club of the league defendant, ... having the purpose or effect of restricting the areas within which broadcasts or telecasts of games ... may be made.

*United States v. National Football League,* No. 12808, Final Judgment, § V (E.D.Pa. Dec. 28, 1953).

In 1961, the NFL entered into a pooled rights television contract with CBS. Concerned that this agreement might violate the terms of Judge Grim's December 28, 1953 decree, the NFL petitioned the court for a construction of the Final Judgment. The NFL sought a determination as to whether that judgment prevented the NFL member clubs from agreeing to sell their pooled television broadcast rights. Concededly, the contract with CBS provided therein that CBS had the "right to determine, entirely within its own discretion ... which games shall be telecast and where such games be televised." *United States v. National Football League,* 196 F.Supp. 445, 447 (E.D.Pa.1961). The court reasoned that this grant of power to CBS to determine which games shall be telecast and where was contrary to Section V of the Final Judgment. *Id.* at 447. The court held, therefore, that the Final Judgment prohibited execution and performance of the pooled rights contract with CBS. *Id.*

A subsequent motion by the NFL for a modification or a temporary suspension of the Final Judgment was denied. *United States v. National Football League,* No.

12808, order entered (E.D.Pa. July 28, 1961). The July 28, 1961 Order specifically enjoined the execution and performance of the NFL–CBS contract "and of the agreement among defendants for the sale of pooled television rights underlying said contract." The Order further enjoined the defendants from entering into "any other contract and agreement having a similar purpose or effect."

### Statutory Antitrust Exemption

On September 30, 1961, the NFL secured enactment of the Sports Broadcasting Act of 1961, which relieved the NFL of the effect of Judge Grim's decision. Pub.L. No. 87–331, § 1, 75 Stat. 732 (codified as amended at 15 U.S.C. § 1291) ("1961 Legislation"). This statute now provides in relevant part, for the following.

> The antitrust laws ... shall not apply to any joint agreement ... by which any league of clubs participating in professional football, baseball, basketball, or hockey contests sells or otherwise transfers all or any part of the rights of such league's member clubs in the sponsored telecasting of the games ... engaged in or conducted by such clubs.

15 U.S.C. § 1291. The 1961 Legislation limited the exemption provided by § 1291 to the extent that telecasts of professional football games on Friday nights and Saturdays during the college football season were forbidden in order to protect college football games from competition with telecasts of professional football games. Pub.L. No. 87–331, § 2 (codified as amended at 15 U.S.C. § 1293). In 1966, when the NFL and the AFL merged, Congress amended § 1291 to provide antitrust immunity to the merger agreement itself. Pub.L. No. 89–800, § 6(b)(1), 80 Stat. 1515 ("1966 Merger Legislation"). At the same time, the restriction on Friday night and Saturday telecasts was expanded to include protection for high school football. *Id.,* § 6(b)(3).

### The Contentions of the Parties

Notwithstanding the clear and unambiguous language of § 1291 that the antitrust laws shall not apply to "any joint agreement," the USFL contends that the exemption is limited to the sale of pooled broadcasting rights to a single network. This contention is based upon the USFL's interpretation of the statute's legislative history and the intent of the NFL at that time to enter into a pooled broadcast rights contract with one network only. The USFL contends that principles of collateral estoppel require the Court to hold that the fact of the NFL's current broadcasting contracts with all three networks amounts to a *per se* violation of the antitrust laws. It is argued that since the 1961 Legislation overruled Judge Grim's decision only to the extent that the NFL contracted with one network, the two remaining agreements violate the antitrust laws under Judge Grim's decision.

The NFL opposes this argument on several grounds. But, as a threshold matter, the NFL contends that the USFL motion places before the Court the basic legal question of whether the antitrust exemption created in 1961 extends to more than one network contract. Stated differently, the motion presents the question whether "the fact that the NFL has contracts with CBS, NBC and ABC is ... in and of itself a violation of the Sherman Act." Defendants' Response to Plaintiffs' Motion for Summary Judgment, at 10. The NFL, in effect, has cross-moved for a declaration that the fact of the three network contracts does not *per se* violate the antitrust laws.

### Legislative History

In considering the issues presented on this motion, the Court is mindful that "exemptions from the antitrust laws are to be narrowly construed." *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979) (citations omitted). It appears to the Court that the statutory language in issue has a plain and unambiguous meaning and that the term "any" means that the antitrust exemption applies to *all* pooled rights contracts that a sports league may enter into. Not one, but all.

Nowhere in § 1291 or the subsequent sections of the 1961 Legislation does it state that the exemption limits the NFL to one network.

■ The NFL contends that this situation renders it unnecessary for the Court to delve into the legislative history of the 1961 Legislation and the 1966 Merger Legislation in order for the Court to rule in its favor. Based upon the plain language of the statute the NFL argues that it is clear that "any" pooled rights agreement is exempt from the antitrust laws.[1] Notwithstanding the presence of such unambiguous language, however, the Court may turn to the legislative history as an aid to analysis, recognizing "that only the most extraordinary showing of contrary intentions from that data would justify a limitation on the 'plain meaning' of the statutory language." *Garcia v. United States,* 469 U.S. 70, 105 S.Ct. 479, 483–84, 83 L.Ed.2d 472 (1984). While a review of the legislative history generally supports the NFL's position, the legislative history does indicate that the antitrust exemption is not "absolute." *See* H.R.Rep. No. 1178, 87th Cong., 1st Sess. 4 (1961).

In support of its "single network" interpretation, the USFL argues that some of the members of the Antitrust Subcommittee of the House Committee on the Judiciary were concerned that under the language of the bill, it might be possible for one league to enter into contracts with all three networks and tie them up so that a rival league, such as the American Football League ("AFL"), would be put at a competitive disadvantage. *Telecasting of Professional Sports Contests: Hearings on H.R. 8757 before the Antitrust Subcomm. (Subcomm. No. 5) of the House Comm. on the Judiciary,* 87th Cong., 1st Sess. 35 (1961). During the course of the hearings, it was agreed that under the bill the NFL could, at that time, utilize all three networks. *Id.* The NFL contended, however, that the objective of the legislation was to give the member clubs "the right to go on a single network." *Id.* Indeed, according to the minutes of meetings among NFL owners, the 1961 Legislation was commonly referred to as the "single network plan."[2] However a proposal suggested by subcommittee counsel, Herbert Maletz, to amend the bill so that it would "specifically prohibit a league from entering into a package contract with more than one network" was not acted upon, in part because the NFL felt that such a clause was unnecessary

**1.** During the course of oral argument on this motion, the NFL contended that the exemption is absolute with respect to the sale of broadcast rights only. The NFL concedes that the exemption does not apply to aspects of contracts that contain terms extending beyond the sale of such rights. *See* Transcript of Proceedings at 40 (April 11, 1986).

**2.** The apparent reason for the label "single network plan" used by the NFL owners was that the legislation allowed the NFL, for the first time, to sell the telecast rights of the individual members clubs' to one seller. Deposition of Alvin R. Rozelle at 302. "The objective of this legislation is to give us the *right* to go on a single network." *Telecasting of Professional Sports Contests: Hearings on H.R. 8757 before the Antitrust Subcomm. (Subcomm. No. 5) of the House Comm. on the Judiciary,* 87th Cong., 1st Sess. 35 (1961) (statement of Hamilton Carothers, NFL counsel) (emphasis added).

This position has to be contrasted with the situation at the time the first CBS pooled rights contract was made. In 1960, nine teams had contracts with CBS, two teams had contracts with NBC, and two teams, Washington and Cleveland, had contracts with sponsors. *United States v. NFL,* Transcript of Proceedings, at 69–71 (E.D.Pa. July 27, 1961). The games of a popular team, such as the New York Giants, therefore would be telecast frequently and over a broad area, while the games of a less popular team would be aired less frequently, if at all, and to smaller audiences. *Id.* at 67. The resultant disparity in television income would upset the league's competitive balance. *Id.* Only by selling the telecast rights of the individual clubs in a package to a network could the league "insure that [the] clubs will continue to have the income to enable them to be competitive on the field." *Id.*

Judge Grim's decision prohibited the clubs from entering into such a contract. *United States v. NFL,* 196 F.Supp. 445 (E.D.Pa.1961). Therefore, the apparent significance to the NFL of the Sports Broadcasting Act of 1961 was that the league would be able to sell the clubs' telecasting rights as a package to a network, not that the league would be limited to one network.

since it had no intention of using more than one network. *Id.* But Commissioner Pete Rozelle predicted that in 20 years the "single network may no longer be desirable, and it may become much better for the public and the league to use more than one network." *Id.*

Commissioner Joe Foss of the AFL also was concerned about possible anticompetitive effects if a league were able to enter into pooled rights telecast contracts with more than one network.

> Theoretically, . . . it might be possible for the members of one league to reach an agreement with a number of purchasers, possibly all three networks, *with the intent or effect of excluding a competitor league from any telecasting.* Thus, this law might very well be utilized to suppress competition and destroy a competing league.

*Id.* at 46 (emphasis added). Commissioner Foss suggested that minor changes in the language of the bill or the inclusion of "some clear language in the committee report" would insure that there would be no doubt that "such activities are not exempted." *Id.* at 47.

> It is my belief that the legitimate objective of this bill should be to exempt the member clubs and the league in each sport from the antitrust laws solely to the extent that those laws would prohibit the pooling of television revenues and rights (i.e., a package contract), and not provide an exemption for actions which might be embodied in a contract with a purchaser or purchasers of the television rights which might be designed to suppress competition outside rather than inside the particular league.

*Id.* at 47. Commissioner Foss's suggestions found their way into the House Report.

> Some concern has been expressed that the language of this section might be considered to give an absolute exemption for the antitrust laws for any kind of television arrangements entered into by a league, and particularly an arrangement which might involve several net-

works and might thus exclude a competing league from all television coverage. This is not the intent of H.R. 9096 which is designed to permit the sale of television rights by a league and its member clubs to a single network. The committee does not intend that an exemption from the antitrust laws should be made available to a league or its members where the *intent or effect* of a joint agreement is to exclude a competing league or its members from the sale of any of their television rights.

H.R.Rep. No. 1178, 87th Cong., 1st Sess. 4 (1961) (emphasis added).

Concern was also expressed on the House floor about ensuring that football telecasts should not be subject to output limitations. *National Collegiate Athletic Ass'n v. Board of Regents,* 468 U.S. 85, —— n. 35, 104 S.Ct. 2948, 2964 n. 35, 82 L.Ed.2d 70 (1984). The following colloquy indicates that multi-network telecasts were expected to prevent such limitations.

> Mr. GARY. On yesterday I had the opportunity of watching three different games. There were three different games on three different channels. . . .
>
> Would this bill prevent them from broadcasting three different games at one time and permit the league to enter into a contract so that only one game would be permitted?
>
> Mr. CELLER. The bill does not prevent what the gentleman saw yesterday.

107 Cong.Rec. 20,060 (1961). Representative Celler also assured Representative Gary that the bill would not prohibit the television audience from seeing games that otherwise would be telecast. *Id.*

The Senate Judiciary Committee Report that favorably recommended passage of the 1961 Legislation states that the legislation's purpose is to "overrule the effect" of Judge Grim's decision. S.Rep. No. 1087, 87th Cong., 1st Sess. (1961), *reprinted in* 1961 U.S.Code Cong. & Ad.News 3042, 3042. The report states that the legislation would enable the member clubs of a professional sports league

to pool their separate rights in the sponsored telecasting of their games and to permit the league to sell the resulting package of pooled rights to *a purchaser,* such as a television network, without violating the antitrust laws.

*Id.* (emphasis added). The report explains that the legislation was necessary to permit a league "to make 'package' sales of the television rights of its member clubs to assure the weaker clubs of the league continuing television income and television coverage." *Id.* at 3043. Paraphrasing the statement of AFL Commissioner Foss, the report stated that the package contract would enable the league to exercise control over the telecasting of league games "to prevent too great disparity in the television income of the various clubs." *Id.* Otherwise, the financial problems of the weaker teams would imperil the continued operation of the league. *Id.* The report also discusses at some length the need to restrict the dates and times during which professional football games may be telecast so that they do not impair college football gate receipts. *Id.* at 3044. The Senate Report does not discuss whether the exemption is limited to one network contract per league other than to state, in conclusion, that the public interest would be served "with minimal sacrifice of antitrust principles by exempting joint *agreements* under which a league sells or transfers pooled television rights of its member clubs to *a purchaser." Id.* (emphasis added).

The 1961 Legislation as passed was not amended to add the suggested specific restriction on the right of a sports league to contract with more than one network for the sale of pooled telecast rights. This contrasts with the treatment accorded to certain Friday night and Saturday broadcasts. As discussed, the Senate Report indicates that concern was expressed that Friday night and Saturday telecasts of NFL games would adversely affect attendance at college football games. *See Id.* at 3043–44. Although Commissioner Rozelle testified that the NFL had no intent to telecast games at those times, he did not give permanent assurances to that effect. *Telecasting of Professional Sports Contests: Hearings on H.R. 8757 before the Antitrust Subcomm. (Subcomm. No. 5) of the House Comm. on the Judiciary,* 87th Cong., 1st Sess. 36–37 (1961). Both the House and the Senate insisted on such an amendment. *See* S.Rep. No. 1087, 87th Cong., 1st Sess. 3 (1961), *reprinted in* 2 1961 U.S.Code Cong. & Ad.News at 3043–44. The 1961 Legislation as passed therefore included a provision that conditioned the antitrust exemption on the NFL not telecasting its games on Friday nights and Saturdays during the college season. *See* 15 U.S.C. § 1293.

The hearings on the NFL–AFL merger provide a further indication that the 1961 Legislation was not intended to limit the NFL from selling pooled telecast rights to more than one network. During the course of hearings on the merger bill, Commissioner Rozelle testified "that because of the logistics of handling perhaps 13 or 14 games on a Sunday afternoon, it would require at least 2 networks." *Professional Football Merger: Hearings on S. 3817 Before the Antitrust Subcomm. (Subcomm. 5) of the House Comm. on the Judiciary,* 89th Cong., 2d Sess. 64 (1966). Subcommittee counsel asked Commissioner Rozelle whether the people of New York City would be able to see professional football on television when the other club is playing a home game. Commissioner Rozelle responded that the league would try to do so, "which is why I feel we will probably have to go to two networks, to assure that each of the 26 or 28 teams has all of its road games brought back to its home city." *Id.* at 66. Furthermore, a memorandum submitted by the NFL and the AFL to the subcommittee addressed the concern that the merger would result in reduced telecasts of football games over free television.

Because a single network cannot practicably establish as many as twenty-eight regional networks and because the expanded league desires to maintain its present level of club television income, the plan contemplates the continued *use*

*of two networks* by the expanded league, *e.g.*, on a conference or other divisional basis. Thus, both during the period prior to the expiration of the existing television contracts and afterwards, it is contemplated that there will be continued home viewer access to duplicate broadcasts, including telecasts of other league games into home cities on days when the home team is playing at home.

*Id.* at 119 (emphasis added). In the face of these plain statements of intent that the merged leagues would continue to use more than one network, no concern was expressed that such conduct would extend beyond the scope of the 1961 exemption. Finally, in response to requests from representatives of high school football groups, the 1966 Merger Legislation expanded the restriction on Friday night and Saturday telecasts of professional football games to include an explicit statement that such broadcasts should not compete with high school football games as well.

### Discussion

The 1961 Legislation was intended to overrule the effect of Judge Grim's decision. *See* S.Rep. No. 1087, 87th Cong., 1st Sess. 1 (1961), *reprinted in* 1961 U.S.Code, Cong. & Ad.News 3042, 3042. The resulting statute exempts from the antitrust laws "any joint agreement" that transfers "all or any part of the rights" of a sports league's member clubs to telecasts of such league's games. 15 U.S.C. § 1291. The Senate Report's statements that a league could sell to "a purchaser" do not persuade the Court that the exemption was intended to limit a league to only one network contract at a time. The statements that a league could sell its pooled telecast rights to a purchaser do not amount to the "extraordinary showing of contrary intentions" that justifies a sharp limitation on the plain meaning of the statutory language. *See Garcia v. United States,* 469 U.S. 70, —— – ——, 105 S.Ct. 479, 482–83, 83 L.Ed.2d 472 (1984). The lack of an explicit limiting provision to this effect in the statute must be contrasted to the express limitation on the exemption that was included to protect college and later high school football contests from competition with telecasts of professional games. *See* 15 U.S.C. § 1293. The only reasonable inference that can be drawn is that Congress did not intend to limit the exemption to one network. This is supported by the legislative history of the 1966 Merger Legislation which contains no indication that it would have been improper for the proposed combined league to telecast its games over more than one network.

Nevertheless, the legislative history demonstrates that it was recognized that there was a danger that one league could tie up all three networks to the competitive detriment of a rival league. But, as discussed, the proposed legislation was not amended to add an explicit restriction to permit only one network contract. Instead, language was added to the House Report emphasizing that the exemption does not extend to situations "where the intent or effect of a joint agreement is to exclude a competing league or its members from the sale of any of their television rights." H.R.Rep. No. 1178, 87th Cong., 1st Sess. 4 (1961). This language was inserted in the committee report to indicate that the antitrust exemption extends only to the prohibition against the pooling of television rights that had been declared illegal by Judge Grim. *Telecasting of Professional Sports Contests: Hearings on H.R. 8757 before the Antitrust Subcomm. (Subcomm. No. 5) of the House Comm. on the Judiciary,* 87th Cong., 1st Sess. 47 (1961) (statement of Joe Foss, AFL Commissioner). Thus, the exemption created by the 1961 Legislation does not confer an "absolute exemption" for any kind of television arrangments involving several networks that work to "exclude a competing league from all television coverage." H.R.Rep. No. 1178, 87th Cong., 1st Sess. 4 (1961).

### Conclusion

█ It is this Court's determination that the fact of the three NFL network contracts does not by itself constitute a violation of the antitrust laws. Whether the

intent or effect of such arrangements are to exclude a competing league, such as the USFL, from selling any of its television rights presents material questions of fact that cannot be decided on a summary judgment motion. These questions will be addressed, presumably, in the upcoming trial in this case. For the purposes of this motion, however, this Court holds that the mere existence of the three NFL-network contracts does not exceed the scope of the antitrust exemption created by the Sports Broadcasting Act of 1961.

Nothing in this opinion should be construed as indicating that an absolute antitrust exemption extends to the circumstances surrounding the three NFL-network contracts. This decision merely holds that the bare fact of the three network contracts does not constitute a violation of the antitrust laws. Having reached that determination, the question whether the principles of collateral estoppel should apply in this case is not presented. The USFL's motion for summary judgment is denied.

SO ORDERED.

### ON MOTION TO STRIKE

The United States Football League and certain of its member clubs (collectively referred to as the "USFL"), have sued the National Football League, its commissioner and certain of its member clubs (hereinafter collectively referred to as the "NFL"), to obtain declaratory and injunctive relief and to recover damages resulting from alleged violations of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 & 2, and the common law.

The NFL has moved, *in limine*, pursuant to Fed.R.Evid. 402 and 403 to strike from plaintiffs' First Amended Complaint ("amended complaint") any reference, and excluding from trial any evidence, which pertains to: (1) previous antitrust litigation against the defendants; (2) the All America Football Conference ("AAFC") or the World Football League ("WFL"); (3) alleged conduct by the NFL against the American Football League ("AFL"); and

(4) any matter concerning sports-related legislation enacted by Congress in 1961 and 1966, other than the fact of such legislation. In a parallel motion, the NFL has moved to strike from the amended complaint any reference, and excluding from trial, any evidence, which pertains to litigation between the Los Angeles Raiders football franchise and the NFL, and between the City of Oakland, California and the Los Angeles Raiders football franchise.

### Procedural Considerations

■ Before the Court addresses the substance of these motions, it is necessary to determine, as a matter of procedure, whether the Court has the authority to grant all of the relief requested. Federal Rules of Evidence 402 and 403, when read together, authorize the Court to rule, *in limine*, that certain evidence should be excluded, either because it is irrelevant, or if relevant, its probative value is substantially outweighed by considerations of prejudice and confusion. In addition, however, the NFL asks the Court to strike certain allegations of the amended complaint as well. Fed.R.Civ.P. 12(f) authorizes the court to strike "from any pleading ... any redundant, immaterial, impertinent, or scandalous matter." But, a motion to strike shall be made before responding to a pleading or within twenty days after the service of a pleading if no responsive pleading is required or permitted. *Id.* In this case, the NFL has clearly exceeded the twenty day limit set forth in the rule. In addition, on a Rule 12(f) motion, "[m]atter outside the pleadings normally is not considered." 5 Wright & Miller, *Federal Practice & Procedure: Civil* § 1380 at 787–88 (1969), *citing Ciprari v. Servicos Aereos Cruzeiro do sul, S.A. (Cruzeiro),* 245 F.Supp. 819, 820 (S.D.N.Y.1965), *aff'd on other grounds,* 359 F.2d 855 (2d Cir. 1966). When confronted with matters outside the pleadings, some courts have treated the motion to strike as one for partial summary judgment. *Ciprari,* 245 F.Supp. at 820; *Banana Distributors, Inc. v. United Fruit Co.,* 19 F.R.D. 11, 13 (S.D.N.Y.

1955). In considering whether it is appropriate to treat the motion to strike as motions for partial summary judgment, the Court is mindful of the Second Circuit's admonition in *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir.1976), that ordinarily a court should not "decide to strike a portion of the complaint—on the grounds that the material could not possibly be relevant—on the sterile field of the pleadings alone." *Id.* at 893 (citations omitted). But where, as here, the party opposing the motion to strike has presented over 150 exhibits, there is little danger that the Court will be unable to determine questions of relevancy and admissibility that generally "require the context of an ongoing and unfolding trial in which to be properly decided." *Id.* The NFL's motion to strike shall therefore be treated as a motion for partial summary judgment.

■ As such, the Court shall apply the same standards it would apply when considering the merits of any other motion for partial summary judgment. On a motion for partial summary judgment, the court's purpose is not to try issues of fact, but rather to determine whether or not there are material issues of fact to be tried. *Meiri v. Dacon*, 759 F.2d 989, 992 (2d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). The party opposing summary judgment must present to the court specific facts showing there is a genuine issue to be tried. Rule 56(e). The Court may consider only "admissible evidence showing any genuine issue to be tried." *Barnett v. Howaldt*, 757 F.2d 23, 26 (2d Cir.1985). If the moving party carries its preliminary burden of demonstrating that there is no genuine issue as to any material fact, the opposing party may not defeat the motion unless it produces "significant probative evidence tending to support [its position]." *United States v. Pent-R-Books, Inc.*, 538 F.2d 519, 529 (2d Cir.1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977) (quotation omitted). The factual record should be viewed in the light most favorable to plaintiffs as the nonmoving parties, *Barnett,* 757 F.2d at 26, meaning that all inferences must be construed in their favor. *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985). With these standards in mind, we now turn to the substantive issues presented by the NFL's motions.

### Contentions of the Parties

"Television is at the heart of this case." Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Motions *In Limine,* at 10; *see also* Transcript of Proceedings at 32 (April 11, 1986) ("This case is a TV case.") The USFL alleges that its inability to obtain a network television contract for the Fall of 1986 was a result of "coercive" pressure applied by the NFL to the three networks not to agree to a Fall 1986 contract with the USFL. In addition, the USFL alleges that the existence of the NFL's three network television contracts has the effect of precluding a new major professional football league from ever having its games televised, thereby depriving it of the television revenues and nationwide exposure a new league requires to be able to compete successfully against the NFL.

The NFL contends that none of the "factual" allegations about the other professional football leagues, the prior antitrust suits against the NFL, or the events surrounding the 1961 and 1966 legislation are probative of any factual issue relating to the USFL's alleged antitrust injury and damages. The USFL contends that the NFL's record of antitrust violations and the history of competition in major league professional football are admissible for two reasons. First, both topics evidence the nature, sources and use of the NFL's market power since Section 1 violations constitute evidence that establishes monopolistic intent, an element of the USFL's Section 2 claim. Second, prior illegal NFL antitrust conspiracies are admissible to establish the intent, motive and method of the NFL's Section 1 conspiracy against the USFL.

### Applicable Law

The USFL argues that all three violations of Section 2—monopolization, at-

tempted monopolization, and conspiracy to monopolize—require proof of both anticompetitive intent and analysis of the defendants' market power, including the sources of that power. *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966) (monopolization requires proof of monopoly power and the willful acquisition or maintenance of monopoly power); *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905) (attempted monopolization requires proof of a dangerous probability of success in monopolizing a given product market and specific intent to build monopoly); *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947) (conspiracy to monopolize requires proof of concerted action with intent to restrain trade and commission of an overt act).

The USFL contends that in appropriate cases, prior antitrust violations and the history of the relevant market are admissible to establish market power and intent. Thus, in *Grinnell*, the Supreme Court noted that defendant's "monopoly was achieved in large part by unlawful and exclusionary practices." 384 U.S. at 576, 86 S.Ct. at 1706. These included: (1) "restrictive agreements that preempted for each company a segment of the market where it was free of competition of the others"; (2) "[p]ricing practices that contained competitors"; (3) acquisitions of competitors; and (4) control of co-defendants that eliminated the possibility of competition. *Id.* (footnote omitted). "By those acquisitions it perfected the monopoly power to exclude competitors and fix prices." *Id.* In *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), the Court noted that "the fact that the power created by size was utilized in the past to crush or prevent competition is potent evidence that the requisite purpose or intent attends the presence of monopoly power." *Id.* at 174, 68 S.Ct. at 937. In *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), the Court stated that "the substantial monopoly which was en-

joyed in Lorain by the publisher from 1933 to 1948," *id.* at 152, 72 S.Ct. at 186, was a circumstance that "illuminated" defendant's attempt to "regain the ... pre-1948 substantial monopoly over the mass dissemination of all news and advertising." *Id.* at 153, 72 S.Ct. at 186.

The USFL also argues that evidence of conspiratorial conduct occurring before plaintiffs' damage period is admissible to establish the intent, motive and method of the defendants' conspiracies against the USFL. In *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), the Court held that the trial court erred when it excluded evidence that the alleged conspiracy and monopolization had begun before the plaintiffs came into the industry. *Id.* at 709–10, 82 S.Ct. at 1415–16.

> This evidence was clearly material to petitioners' charge that there was a conspiracy and monopolization in existence when they came into the industry, and that they were eliminated in furtherance thereof. We do not mean that a trial court may not place reasonable limits upon such evidence or set a reasonable cut-off date, evidence before which point is to be considered too remote to have sufficient probative value to justify burdening the record with it.

*Id.* at 710, 82 S.Ct. at 1416 (footnotes omitted). *See also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 228–31, 60 S.Ct. 811, 846–48, 84 L.Ed. 1129 (1940) (exclusion of certain evidence describing background and operation of market upheld). While these general principles are virtually unassailable, the question presented is their application to the factual allegations objected to by the NFL.

*AAFC and WFL Allegations*

The NFL argues that there are no allegations in the complaint, nor have any facts been presented by the USFL, showing that the NFL caused the AAFC's dissolution in 1947 or the WFL's dissolution in 1975. According to the NFL, the mere fact that the two leagues existed and disbanded is irrele-

vant to any issue concerning the size of the 1980's professional football market, its structure, or operation or the NFL's alleged anticompetitive intent or alleged predatory conduct against the USFL. In the cases relied upon by the USFL, where plaintiffs have shown damages as a result of a conspiracy which predated plaintiff's entrance into the market, the courts have permitted evidence of prior conduct because the identical conspiracy was involved. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Strobl v. New York Mercantile Exchange*, 582 F.Supp. 770 (S.D.N.Y.1984), *aff'd*, 768 F.2d 22 (2d Cir.), *cert. denied*, ── U.S. ──, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985). Unless the USFL is able to produce evidence that the NFL somehow caused the breakup of the two leagues, it is argued, the allegations concerning the two prior leagues are irrelevant to any claim of an ongoing conspiracy to monopolize the United States market for professional football. The NFL contends that the USFL has not presented admissible evidence showing that there is any material question of fact that the NFL unlawfully caused the demise of the WFL. In the absence of facts showing such causal connection, the NFL contends that no fact material to the USFL's charges against the NFL will be made more or less probable by evidence concerning the existence and disbandment of either league.

At oral argument, the USFL conceded that the allegations concerning the AAFC appear in the pleadings for background purposes only. Transcript of Proceedings at 77 (April 11, 1986). Accordingly, with respect to the AAFC, the motion is granted. The USFL shall make no reference, and shall offer no evidence at trial, that implies that the NFL caused the demise of the AAFC. In addition, those portions of the amended complaint alluding to such matters shall be stricken. This ruling does not, however, preclude the USFL from referring to the AAFC in the context of a presentation for background purposes of the history of professional football in the United States.

Two incidents have come to the Court's attention that provide a basis for allegations that the NFL harmed or attempted to harm the WFL. The first arose out of the 1973 attendance by Robert Wussler, then President of CBS Sports, at a WFL owners' meeting. The USFL claims that NFL Commissioner Rozelle let it be known to the networks that he considered Wussler's attendance to be an unfriendly act. The USFL relies upon this incident both to prove that the NFL entertained anticompetitive intent toward the WFL and to prove that in 1981–82 the NFL pressured the networks not to give the fledgling USFL a television contract. In December 1981, the USFL's publicity agent invited the President of CBS Sports to attend a January 1982 Florida meeting of prospective USFL owners. One CBS executive advised the other not to attend since Wussler's attendance at the 1973 WFL meeting "was enormously embarrassing to CBS and considered an unfriendly act by Pete [Rozelle]." Memorandum from Carl Lindemann to Neal Pilson, President, CBS Sports (Dec. 29, 1981).

When questioned about the Wussler incident during his deposition in this case, Commissioner Rozelle recalled that he told Robert Wood, President of CBS in 1973, that Rozelle had heard that Wussler, the head of CBS Sports, had attended a WFL meeting. "I was somewhat surprised because CBS had just entered into a four-year contract with us for playing Sunday." Deposition of Alvin R. Rozelle at 408. Rozelle explained that since the law did not permit the NFL to play on Friday nights or Saturdays, and he understood that the WFL was not interested in playing games during prime time, "I was just very surprised by what I heard concerning a sports head going down there to a meeting." *Id.*

■ Rozelle's testimony concerning this incident raises a material question of fact as to whether there was an attempt to pressure CBS, if not the other networks, to avoid any involvement with the WFL. This is consistent with the USFL's theory that

the same tactics have been used to discourage the networks from giving the USFL a contract to televise USFL games. A triable issue of fact exists as to whether the NFL in this way contributed to the demise of the WFL or attempted to deprive the WFL of a network contract as part of the NFL's alleged efforts to regain its pre-WFL monopoly.

The second instance of alleged NFL misconduct directed against the WFL is set forth in ¶ 61(a) of the amended complaint, which alleges that in 1985 the NFL "reinstituted a policy, first developed by the defendant NFL Member Clubs when the WFL came into being and abandoned by the defendant NFL Member Clubs after the WFL's demise" to permit the signing of free agent players to NFL contracts for future seasons after the completion of the sixth weekend of play in the current season. Amended Complaint ¶ 61(a). Previously, such signings were not allowed until the end of the then-current season. *Id.*

■ While there is little or no evidence that the change in the free-agent signing rule harmed the WFL, the NFL's alleged parallel response to the two leagues raises a triable issue of fact as to the NFL's monopolistic intent with respect to the WFL and later the USFL.[1]

The decisions in *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) and *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), support the proposition that the history of how a monopolist achieved its position is relevant. The USFL has presented specific facts demonstrating that the allegations that the NFL unlawfully caused or attempted to cause the demise of the WFL are not "fanciful." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). Accordingly, with respect to the WFL, the motion is denied.

### AFL Allegations

The USFL's allegations concerning the AFL are also defective. While the amended complaint alleges that the AFL competed with the NFL and prospered, it also alleges that the NFL sought to frustrate the formation of the AFL by creating new NFL franchises. Paragraph 22 of the amended complaint quotes a statement by the owner of the Washington Redskins in 1960, Mr. Marshall, that the only reason for the expansion was to destroy the new AFL. In *American Football League v. National Football League*, 205 F.Supp. 60 (D.Md.1962), *aff'd*, 323 F.2d 124 (4th Cir. 1963), it was held that these allegations were false. The AFL's claims of monopolization, attempted monopolization and conspiracy to monopolize against the NFL were dismissed. Both courts held that NFL expansion plans antedated the AFL's formation. 205 F.Supp. at 78, *aff'd*, 323 F.2d at 132. Both courts also held that Mr. Marshall's statement was "not true." 205 F.Supp. at 74, *aff'd*, 323 F.2d at 132.

■ The NFL urges that in the interests of stability in the law and judicial economy that these findings should be given collateral estoppel effect and that the USFL not be permitted to resurrect stale claims that were rejected when they were fresh. *Cf.*

---

1. The USFL also cites the Congressional testimony of Ed Garvey, former Director of the National Football League Players Association, in support of its allegation that the NFL violated the antitrust laws in causing the demise of the WFL. *See* Transcript of Proceedings at 76 (April 11, 1986). According to Mr. Garvey,

 because the [NFL] can negotiate with all three networks, it is difficult for any potential competitor such as the World Football League to survive. One might well trace the downfall of the World Football League to the fact that all three networks carry NFL football and that can be traced to the 1961 exemption.

*Inquiry into Professional Sports: Hearings Before the House Select Comm. on Professional Sports,* 94th Cong., 2d Sess. 219 (1976). This testimony does nothing more, however, than to highlight, as the court observed in *Mid-South Grizzlies v. NFL,* 720 F.2d 772 (3d Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984), that the 1961 and 1966 legislation created "a formidable barrier to entry by a competitive football league." *Id.* at 785 n. 7. *See* note 3, *infra.* Mr. Garvey did not allege that the NFL did anything in violation of the antitrust laws.

*Bronson v. Board of Education,* 525 F.2d 344, 349 (6th Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976); *United States v. 177.51 Acres of Land,* 716 F.2d 78, 81 (1st Cir.1983); *Arizona v. California,* 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). In addition, unless the USFL presents new, credible, persuasive evidence which could not have been presented at the original trial, the allegations concerning the AFL should not be presented to the jury. *See 177.51 Acres of Land,* 716 F.2d at 81. The USFL has not indicated that such evidence exists. Accordingly, the motion is granted. Plaintiffs shall make no reference nor offer any evidence at trial concerning supposed conduct by the NFL directed at the AFL. The portions of the amended complaint where such allegations are set forth are hereby stricken. This ruling does not preclude the USFL from presenting evidence of the AFL as part of a background presentation of the development or history of professional football in the United States.

### Sports-Related Legislation

With respect to the Sports Broadcasting Act of 1961 and the 1966 legislation authorizing the NFL–AFL merger, the amended complaint alleges as factual matters, *inter alia,* the following: (1) the reasons why the NFL petitioned Congress; (2) Congress' purpose in enacting the Sports Broadcasting Act of 1961; (3) that the NFL network television contracts exceed the scope of the antitrust exemption; (4) the NFL's motive for seeking the 1966 legislation immunizing the merger with the AFL; (5) impropriety in the manner in which Congress enacted the merger law; and (6) the motives of two United States Senators. The USFL argues that a review of the history of the NFL's acquisition and the use of its market power with respect to the passage of legislation is an appropriate subject for the jury to consider.

Similar allegations were made by the plaintiffs in *Mid-South Grizzlies v. National Football League,* 720 F.2d 772, 784 (3d Cir.1983), *cert. denied,* 467 U.S. 1215,

104 S.Ct. 2657, 81 L.Ed.2d 364 (1984), to support a claim of "unlawful acquisition of monopoly power." The court rejected these contentions.

If these allegations are true, as we must assume for purposes of a summary judgment motion, they are, perhaps, instructive on the nature of the federal legislative process. For purposes of rule of reason analysis, however, *they are irrelevant.* It would take a court bolder than this to claim that the congressionally authorized acquisition of market power, even market power amounting to monopoly power, was unlawful under Section 1 of the Sherman Act.

*Id.* (emphasis added).

■ This Court is of the same view. The reasons why the NFL sought such legislation, Congress' motives and the manner in which it enacted such laws are not issues of fact to be determined by a jury in an antitrust lawsuit. As a threshold matter, the interpretation of legislation ordinarily is a question of law to be resolved by the court. *Bryant v. American National Bank & Trust Co. of Chicago,* 407 F.Supp. 360, 363 (N.D.Ill.1976). Plaintiffs have not brought to this Court's attention any authority for the proposition that the legislative history of a statute may be presented to a jury in a case of this nature.

Second, the activities of the NFL in lobbying Congress in connection with the passage of the Sports Broadcasting Act of 1961 and the 1966 legislation approving the NFL–AFL merger cannot be made the basis of antitrust liability. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In *Noerr,* the Supreme Court held that efforts to influence the government to take particular action that would produce a restraint or monopoly do not violate the Sherman Act. *Id.* at 136, 81 S.Ct. at 529.

In *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court restated the proposition that "[j]oint efforts to influence public officials do not violate the antitrust

laws even though intended to eliminate competition." *Id.* at 670, 85 S.Ct. at 1593. The Court also stated, however, that evidence of such immune conduct could be admitted within the discretion of the trial court, "if it tends reasonably to show the purpose and character of the particular transactions under scrutiny." *Id.* at 670 n. 3, 85 S.Ct. at 1593 n. 3 (quotation and citations omitted). Such evidence, to be admitted, would have to be found probative, yet not unduly prejudicial. *Id.*

One method of determining the admissibility of this evidence is to weigh its probative value and plaintiff's need for the evidence against the possibility that the admission of such evidence will prejudice the defendants' First Amendment rights. *See Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530, 543 n. 7 (5th Cir.1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). The USFL contends that the NFL's lobbying efforts in 1961 and 1966 were part of a long-standing conspiracy to monopolize the market in professional football. But an important aspect of the NFL's purpose in seeking the 1961 exemption was to join the other professional sports organizations in being able to enter into pooled rights television contracts. *See* S.Rep. No. 1087, 87th Cong. 1st Sess. (1961), *reprinted in* 1961 U.S.Code Cong. & Ad.News 3042, 3042–43. One of the terms of the 1966 merger was an increase in the number of teams. Also, at the NFL's request, the merger legislation did not "extend to the combined league any greater antitrust immunity" than existed before the merger. S.Rep. No. 1654, 89th Cong., 2d Sess. 3 (1966).

**2.** *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 296 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), *quoting United States v. Aluminum Co. of America,* 148 F.2d 416, 429 (2d Cir.1945) ("the origin of a monopoly may be critical in determining its legality").

**3.** In *Mid-South Grizzlies,* no claim was made "that abuse of NFL market power led to the demise of the World Football League." 720

▮ In addition, to whatever extent such conduct evidences monopolistic intent, it is cumulative to other evidence that plaintiffs have cited to Court. As evidence of the NFL's state of mind in the 1980's it is weak, since the lobbying occurred from fifteen to twenty years before the events at issue in this case took place. The low probative value of this evidence is substantially outweighed by the defendants' strong interest in preserving their First Amendment rights to petition Congress. Accordingly, evidence of the NFL's lobbying efforts and intentions with respect to the 1961 and 1966 sports-related legislation shall be excluded under Fed.R.Evid. 403 since the unfair prejudice to defendants First Amendment rights substantially outweighs the probative value of the evidence.

▮ Notwithstanding the irrelevance and inadmissibility of these matters, or that the NFL's market power may have a "pristine 'origin,'"[2] these considerations do not render the NFL immune from antitrust liability in the event such market power is "abused against extra-league competitors." *Id.* 720 F.2d at 785 n. 7.[3] But, for the reasons discussed, the motion is granted. Plaintiffs shall make no reference nor offer any evidence at trial describing the NFL's reasons for seeking the 1961 and 1966 legislation nor the motives and manner in which Congress enacted those laws. This does not preclude the USFL from offering evidence of such legislation as part of a background presentation of the history of professional football in the United States.

### Prior NFL Antitrust Judgments

The NFL has been named a defendant in at least eighteen antitrust lawsuits. The NFL lost the following such lawsuits:

F.2d at 784–85. The court did offer the following observation, however.

"There is no doubt that the NFL structure authorized by the 1961 and 1966 legislation in itself presents a formidable barrier to entry by a competitive football league. That legally countenanced barrier might well, if abused against extra-league competitors, result in antitrust liability. But the issue of competition by another league is not presented here ...." *Id.* at 785 n. 7.

(a) *United States v. National Football League,* 116 F.Supp. 319 (E.D.Pa.1953), in which certain television and radio broadcast rules were declared unreasonable restraints of trade. This decision was overruled, in part, by the Sports Broadcasting Act of 1961;

(b) *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 726 F.2d 1381 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984) (hereinafter *L.A. Coliseum*) in which an intraleague rule concerning franchise relocation was declared an unreasonable restraint of trade;

(c) *Kapp v. National Football League,* 390 F.Supp. 73 (N.D.Cal.1974), *vacated in part,* 1975–2 Trade Cas. (CCH) ¶ 60,543 (N.D.Cal.1975), *aff'd,* 586 F.2d 644 (9th Cir. 1978), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979), in which certain rules concerning the transfer of veteran players from one NFL team to another were found to constitute an unreasonable restraint of trade. No damages were awarded;

(d) *Mackey v. National Football League,* 543 F.2d 606 (8th Cir.1976), *cert. dismissed,* 343 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), in which intraleague rules relating to the transfer of veteran players from one NFL team to another were held to be unreasonable. This case was later settled through collective bargaining with the NFL players union. *See Reynolds v. National Football League* 584 F.2d 280 (8th Cir.1978) (approving elements of settlement);

(e) *Smith v. Pro Football, Inc.,* 593 F.2d 1173 (D.C.Cir.1978), in which rules for the college player draft were held unreasonable under the rule of reason;

(f) *North American Soccer League v. National Football League,* 505 F.Supp. 659 (S.D.N.Y.1980) *aff'd in part, rev'd in*

part, 670 F.2d 1249 (2d Cir.), *cert. denied,* 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982), in which a rule forbidding NFL franchise owners from owning other professional sports teams was held to violate Section 1 of the Sherman Act.[4]

The NFL has moved to strike from the amended complaint any reference and to exclude from trial any evidence which pertains to previous antitrust legislation against the defendants. The USFL argues that it is appropriate in this case to consider these past Section 1 violations as relevant to proving a Section 2 violation. In two of the cases relied upon by the USFL, *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), and *Union Leader Corp. v. Newspapers of New England, Inc.,* 284 F.2d 582 (1st Cir.1960), *cert. denied,* 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961), the same conduct that was found to violate Section 1 provided a basis for finding a Section 2 violation. In neither case, however, was an earlier unrelated Section 1 judgment held to be relevant to prove a Section 2 claim brought by a competitor. The NFL argues that these cases demonstrate only that the same conduct simultaneously may violate both sections. In both cases the Section 1 violations involved restraints of trade against a competitor, which conduct was relevant to demonstrating monopolistic intent and conduct against the same competitor.

The NFL argues that in order for its prior antitrust lawsuits to be relevant to the instant matter, there must be a direct, logical connection to the allegations in this case. *See, e.g., Buckhead Theatre Co. v. Atlanta Enterprises,* 327 F.2d 365 (5th Cir.), *cert. denied,* 379 U.S. 888, 85 S.Ct. 158, 13 L.Ed.2d 92 (1964). In *Buckhead Theatre* the court held that evidence of a prior antitrust judgment would be irrele-

---

**4.** The USFL argues that *Hecht v. Pro-Football, Inc.,* 570 F.2d 982 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978), which involved a challenge to certain exclusive lease provisions, should also be considered an adverse result to the NFL. But, the

NFL was dismissed from this case, and the decision reversing a jury verdict in favor of the Redskins ruled that certain jury instructions were erroneous. 570 F.2d at 998–99. The court did not hold that the exclusive lease provisions violated the antitrust laws.

vant unless the plaintiff introduced evidence that the practices complained of in the prior case "had any injurious effect upon the plaintiff." 327 F.2d at 368–69. Even in *Bray v. Safeway Stores, Inc.*, 392 F.Supp. 851 (N.D.Cal.), *vacated per settlement*, 403 F.Supp. 412 (N.D.Cal.1975), relied upon by plaintiffs, the conduct underlying the prior judgments was the same as that alleged in the main case. 392 F.Supp. at 866–67 (abuse of buying power in order to fix prices).

The foregoing authorities indicate that plaintiffs bear the burden of showing that the conduct underlying earlier Section 1 judgments against the NFL is related to the conduct at issue in this case. This can be done either by demonstrating that there is a similarity of conduct or presenting some evidence that the prior conduct has injured plaintiff. Instead, the USFL argues, in conclusory fashion, that the prior antitrust judgments supply crucial evidence of a long-standing antitrust conspiracy dating back to the 1940's, which casts light on the current antitrust conspiracy. It contends that such evidence helps to establish the intent, motive and method of defendants' conspiratorial conduct directed against the plaintiffs. The USFL, however, has not presented specific facts that connect the alleged anticompetitive activity in the instant case to the past instances of the NFL's antitrust conduct.

■ The prior antitrust violations in this case involve intraleague rules concerning players, franchise matters, and broadcast rules. They have no logical tendency to show an intent to act against a competing league. They are therefore irrelevant. *See, e.g., Monticello Tobacco Co. v. American Tobacco Co.*, 197 F.2d 629, 632 (2d Cir.), *cert. denied*, 344 U.S. 875, 73 S.Ct. 168, 97 L.Ed. 678 (1952) (exclusion upheld since nothing in prior antitrust conspiracy affected plaintiff).

Even if it is assumed, *arguendo*, that any or all of these prior NFL adverse antitrust judgments are relevant to any of the issues in the instant case, they should be excluded under Fed.R.Evid. 403. Rule 403 permits the exclusion of evidence on the grounds of prejudice, confusion or waste of time.

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403. These considerations were applied by the court in *International Shoe Machine Corp. v. United Shoe Machinery Corp.*, 315 F.2d 449 (1st Cir.), *cert. denied*, 375 U.S. 820, 84 S.Ct. 56, 11 L.Ed.2d 504 (1963), to exclude evidence of prior adverse antitrust judgments.

> Whether admitted purely as "background" evidence or not, evidence of a judicial determination of prior illegal conduct on the part of the defendant cannot help but have a great emotive impact on a jury.

315 F.2d at 459. These considerations take on heightened importance where, as here, the evidence has such slight probative value, "but potentially high emotive impact on a jury of laymen." *Monticello Tobacco Co.*, 197 F.2d at 633. *See also Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 710 (2d Cir.1983) (prior bribery evidence held "inflammatory," *citing International Shoe Machine Corp.*). To permit the USFL to introduce evidence of these prior antitrust judgments would permit plaintiffs to create an "aura of guilt" or to "imply new wrongdoing from past wrongdoing." *International Shoe Machine Corp.*, 315 F.2d at 460. Accordingly, the motion to strike allegations and to exclude evidence of prior antitrust litigation against defendants is granted to the extent such evidence would otherwise be offered at trial as part of plaintiffs' case-in-chief. The Court reserves its decision as to whether such matters may be admitted into evidence in the event plaintiffs present a rebuttal case.

### Litigation Arising from the Raiders Move

The NFL has moved to strike allegations from the amended complaint and to exclude

from trial any evidence which pertains to litigation between the Los Angeles Raiders football franchise and the NFL, and between the City of Oakland, California and the Los Angeles Raiders football franchise. The move of the Raiders franchise from Oakland, California to Los Angeles, California has spawned several lawsuits. In *L.A. Coliseum,* 726 F.2d 1381 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984), a NFL intra-league rule regarding movement of franchises was declared an unreasonable restraint of trade. In *City of Oakland v. Oakland Raiders,* 174 Cal.App.3d 414, 220 Cal.Rptr. 153 (1985), *review denied,* N.Y. Times, Feb. 28, 1986 at A23, col. 1 (Cal. Feb. 27, 1986), the City of Oakland's attempt to condemn the Raiders franchise through the power of eminent domain was dismissed. Lastly, in *United States Football League v. National Football League,* Civ. No. 85–5445, filed Aug. 8, 1985 (N.D.Cal.), the USFL alleges that as part of the NFL's effort to return the Raiders to Oakland in order to keep Oakland available for the awarding of an NFL expansion franchise, the NFL and the City of Oakland have conspired to prevent the success of the USFL Oakland Invaders.

At the outset, the NFL contends that the Supreme Court's denial of the NFL's petition for certiorari on the liability issues in the *L.A. Coliseum* case does not constitute a final judgment. Such issues, it contends, remain reviewable in the event an appeal is made of the damages judgment. *See Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 365 n. 1, 93 S.Ct. 647, 650 n. 1, 34 L.Ed.2d 577 (1973); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 488 n. 6, 88 S.Ct. 2224, 2228 n. 6, 20 L.Ed.2d 1231 (1968); *Mercer v. Theriot,* 377 U.S. 152, 153, 84 S.Ct. 1157, 1158, 12 L.Ed.2d 206 (1964); *Indianapolis v. Chase National Bank,* 314 U.S. 63, 75, 62 S.Ct. 15, 19, 86 L.Ed. 47 (1941). Even assuming that the USFL is correct that the result in the *L.A. Coliseum* case is a final judgment for purposes of issue preclusion, the Court adopts its holding with respect to the other earlier

NFL antitrust litigation and holds that the result in the *L.A. Coliseum* case is irrelevant to the issues presented in the instant case. The USFL contends that the Supreme Court's decision in *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), supports the admissibility of the judgment in the *L.A. Coliseum* case. *Grinnell* is distinguishable. In *Grinnell,* the Court held that the defendants achieved their monopoly by, *inter alia,* use of unlawful restrictive agreements that divided segments of the market among the defendants. *Id.* at 576, 86 S.Ct. at 1706. It is true that the Raiders litigation involved scrutiny of an agreement designed to regulate the division of the geographic market among the NFL member clubs. But, in the *L.A. Coliseum* case the court held that "the nature of NFL football requires some territorial restrictions." 726 F.2d at 1396. Furthermore, in order to effectuate the NFL's antitrust exemption granted by 15 U.S.C. § 1291, the court held that the NFL is entitled to have some control over the placement of teams. *Id.* No such justification for market allocation existed in *Grinnell.* The antitrust violation in the Raiders case occurred because the mechanism used to achieve that geographic division was found to be harmful to intra-league competition. *Id.* Unlike *Grinnell,* the fact of geographic market allocation as part of the business of professional football does not violate the antitrust laws. Lastly, the *L.A. Coliseum* case arose out of events that occurred before the formation of the USFL so that the antitrust violation at issue could not have harmed the USFL.

 The eminent domain litigation between the City of Oakland and the Raiders is irrelevant since neither of the parties in that action are parties in the instant case. In addition, the allegations of the second *USFL v. NFL* litigation are relevant to the claims in this case. Moreover, the USFL contends that certain of the testimony of Al Davis, the owner of the Los Angeles Raiders, regarding aspects of the California lawsuits, is relevant to the issues herein. Specifically, he has testified to al-

leged efforts by the NFL to hinder the success of the USFL Oakland Invaders franchise. This testimony may be relevant to the issues presented in the instant case, to the extent that it helps to establish a broader NFL conspiracy to destroy the USFL. There should be no bar to the introduction of relevant, admissible evidence through Mr. Davis, or some other witness or means, to such effect. In all other respects, however, the motion is granted.

## CONCLUSION

In summary, the NFL's motions *in limine* are granted in the following respects: (1) allegations in the amended complaint that the NFL caused the demise of the AAFC are stricken and evidence of such matters shall be excluded at trial; (2) allegations of predatory conduct by the NFL directed at the AFL are stricken and evidence of such matters at trial shall be excluded; (3) allegations of matters relating to the passage of the 1961 and 1966 sports-related legislation shall be stricken and evidence of such matters shall be excluded at trial; (4) allegations pertaining to previous antitrust litigation against the defendants are stricken and evidence of such matters shall be excluded from plaintiffs' case-in-chief; and (5) evidence of litigation between the City of Oakland and the Los Angeles Raiders football club shall be excluded from evidence at trial. In all other respects, the motions are denied.

SO ORDERED.

## ON MOTION FOR PARTIAL SUMMARY JUDGMENT

The NFL[1] has moved, pursuant to Fed. R.Civ.P. 56, for partial summary judgment as to: 1) plaintiffs' "stadium-related"

claims; 2) plaintiffs' "disparagement" claims; and 3) plaintiffs' "game officials" claims. The NFL has moved, in the alternative, for severance of plaintiffs' stadium-related claims pursuant to Fed.R.Civ.P. 42(b).

A threshold issue as to all of these motions is whether the USFL has actually stated separate and distinct claims as to stadium-related conduct, disparagement, and game officials.[2] The USFL argues that the NFL has deliberately misconstrued the nature of the First Amended Complaint ("amended complaint" or "complaint"). Plaintiffs maintain that the complaint pleads defendants' acts and practices not as separate causes of action, but as part of an integrated plan by defendants to "conquer the USFL." Thus, it is argued, the USFL has done nothing more than exercise the prerogative of a private antitrust plaintiff to sue on the basis of aggregate anticompetitive conduct. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1303 (9th Cir.), *cert. denied*, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982).

Were this Court to agree with the USFL's characterization of the amended complaint, then defendants' motions would have to be treated as motions for summary judgment as to parts of claims. Although a defending party is certainly permitted to make such a motion, *see* Fed.R.Civ.P. 56(b), federal courts are not authorized to enter summary judgment as to a portion of a claim. *See* 10A Wright, Miller & Kane, *Federal Practice & Procedure: Civil 2d* § 2737 at 457 (West 1983). Rather, in such instances, the trial court is empowered to enter an order under Rule 56(d) setting forth non-controverted facts and withdrawing sham issues from the case. *Id.* at

---

**1.** Plaintiffs in this action are the United States Football League and certain of its member clubs (hereinafter collectively referred to as the "USFL"). Defendants are the National Football League, its commissioner and certain of its member clubs (hereinafter collectively referred to as the "NFL"). The USFL has sued the NFL for declaratory and injunctive relief, as well as damages, for alleged violations of Sections 1

and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. Plaintiffs also seek similar relief under two pendent common law claims for interference with existing and prospective contractual relations.

**2.** The nature of each of these "claims" is detailed at the beginning of Parts I, II, and III of this opinion.

457–58; *see Fraser v. Doubleday & Co.*, 587 F.Supp. 1284, 1287 (S.D.N.Y.1984); *Dundee Wine & Spirits, Ltd. v. Glenmore Distilleries Co.*, 238 F.Supp. 283, 289 (E.D. N.Y.1965).

A review of plaintiffs' amended complaint[3] supports the USFL's position that its antitrust claims are consciously omnibus in nature. Accordingly, the Court will not, on the present motions for summary judgment, treat individual allegations of anticompetitive conduct as separate "claims," but will endeavor only to "ascertain what material facts exist without substantial controversy." Fed.R.Civ.P. 56(d). Plaintiffs' common law claims, however, are more readily divisible into separate claims for purposes of summary judgment. In particular, Count IV of the amended complaint contains specific allegations of defendants' intentional interference with the USFL's prospective contracts with "several groups, individuals and entities, including players, coaches, officials, and national television networks." Amended Complaint ("AC") ¶ 94. Count IV also contains specific allegations of defendants' interference with plaintiffs' ability to procure stadium leases. *See* AC ¶ 95(e). Accordingly, the Court finds that, for purposes of Fed.R. Civ.P. 56, plaintiffs have stated distinct common law claims with regard to stadia and game officials.

3. The amended complaint sets forth four causes of action. Count I seeks injunctive and declaratory relief, as well as damages, for alleged violations of Section 2 of the Sherman Act. Amended Complaint ("AC") ¶¶ 14–75. Count II (which incorporates the allegations in Count I) seeks injunctive and declaratory relief, as well as damages, for alleged violations of Section 1 of the Sherman Act. AC ¶¶ 76–86. Count III seeks injunctive and declaratory relief, as well as damages, under the common law principles of intentional interference with contract. AC ¶¶ 87–92. Count IV seeks injunctive and declaratory relief, as well as damages, under the common law principles of intentional interference with (prospective) business and contractual relations. AC ¶¶ 93–99.

4. Specifically, the USFL alleges that certain NFL teams have obtained "unlawful exclusivity provisions and other illegal restrictive provisions" in their respective stadium agreements that have effectively prevented the USFL teams in the

In deciding defendants' tripartite motion for summary judgment, this Court's purpose is not to resolve issues of fact, but merely "to determine whether any material factual issues are raised after resolving all questionable inferences in favor of the party against whom the judgment is sought." *United States v. Matheson*, 532 F.2d 809, 813 (2d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976). With that basic concept in place, the motions will now be addressed seriatim.

### I. Stadium-Related Conduct

In essence, the USFL alleges that the NFL and its member clubs, acting separately as well as in various alliances, engaged in numerous acts directed at preventing existing and potential USFL clubs from gaining adequate access to suitable stadium facilities.[4] Plaintiffs allege that such conduct (which may be generally referred to as "stadia interference") violated Sections 1 and 2 of the Sherman Act, insofar as it represented a key element in defendants' overall plan "to eliminate plaintiffs as competitors in major league professional football." AC ¶ 66. The USFL has also asserted a separate common law claim, for intentional interference with contractual relations, based on defendants' stadium-related conduct. *See* AC ¶ 95(e).

same territories from using those stadia in the fall, or (in some instances) at any time. *See* AC ¶ 67. Plaintiffs further allege that defendants have obtained and enforced such restrictive provisions in stadium leases "in order to foreclose potential competition by the [USFL]." AC ¶ 68.

Plaintiffs elsewhere allege that defendants violated Section 2 of the Sherman Act by "attempting to monopolize, conspiring to monopolize and monopolizing the market for essential stadium facilities in which to play major league professional football in major metropolitan areas throughout the United States." AC ¶ 71(d). The NFL has pointed out that this allegation rests, in part, upon the dubious assumption that the only stadium facilities suitable to major league football are those in which an NFL team is already playing. *See* NFL Stadium Memorandum at 33–35 (arguing that a Section 2 claim based on stadia interference must fail because the relevant geographic market is nationwide and the USFL has undisputed access to stadia throughout the country).

From a review of the USFL's papers, it appears that allegations have been specifically made with regard to eleven stadia.[5] The NFL has suggested, and the USFL does not seriously contest, that the allegations may be divided into four separate groups: 1) alleged denials of access to stadia during the spring; 2) alleged denials of access to stadia during the fall (following the USFL's decision to abandon its spring schedule); 3) alleged delays in obtaining stadium leases; 4) alleged harm to USFL franchises through the granting of stadium leases with disadvantageous terms.

The NFL contends that the USFL has offered no admissible evidence, see Fed.R. Civ.P. 56(e), that establishes either: 1) direct involvement by the NFL in the stadium lease and use arrangements negotiated by individual NFL clubs; or 2) any concerted action by NFL clubs or uniformity of position by such clubs with regard to the terms of stadium leases. To the contrary, the NFL insists, the deposition testimony of key NFL figures establishes the absence of such league involvement or concerted action. Having reviewed the record with considerable care, this Court agrees that a large portion of the evidence proferred by the USFL is either inadmissible hearsay that may not be relied upon in opposing a motion for summary judgment, see, e.g., Burlington Coat Factory Warehouse Corp. v. Esprit de Corp., 769 F.2d 919, 924 (2d Cir.1985), or is simply immaterial to the allegations plaintiffs are seeking to prove.

Nonetheless, it may be assumed, for purposes of the ensuing discussion of Noerr-

Pennington immunity, that the USFL's stadium-related allegations are supported by admissible evidence. Such an assumption, which exceeds the general requirement that all inferences and ambiguities in the factual record be construed in favor of the party opposing summary judgment, see, e.g., PPX Enterprises, Inc. v. Audiofidelity, Inc., 746 F.2d 120, 123 (2d Cir.1984), permits the Court to consider whether, as a matter of law, the NFL's stadium-related conduct could have possibly violated the antitrust laws.

### A. Noerr-Pennington

It is undisputed that, in all but one instance, the USFL's allegations of denial of stadium access are directed at the failure of a state or local governmental authority to grant a lease to a potential USFL team, to grant a lease as quickly as plaintiffs would have liked, or to grant a lease on terms sufficiently favorable to the USFL lessee.[6] Plaintiffs reject any suggestion, however, that these local governmental authorities exercised "free discretion" in considering applications by USFL clubs for stadium leases. Rather, the USFL alleges that, in numerous instances, the governmental authorities that own and operate local stadia have dealt harshly with USFL applicants as a direct result of pressure by the NFL and/or its member clubs. Such pressure, the USFL maintains, includes threats by NFL clubs to abandon certain cities and stadia; or (in cities that do not currently have NFL franchises) engaging

---

**5.** These are: Jack Murphy Stadium (leased by the NFL's San Diego Chargers); Cleveland Stadium (leased by the NFL's Cleveland Browns); Candlestick Park (leased by the NFL's San Francisco 49ers); New Orleans Superdome (leased by the NFL's New Orleans Saints); Mile High Stadium (leased by the NFL's Denver Broncos); Pontiac Silverdome (leased by the NFL's Detroit Lions); Memorial Stadium (leased in 1983 by the NFL's Baltimore Colts); Veterans Stadium (leased by the NFL's Philadelphia Eagles); and Alamo Stadium in San Antonio.

In addition, the USFL has alleged improper conduct by defendants with respect to Hubert H. Humphey Metrodome, where the NFL's Minnesota Vikings have been granted an exclusive lease to play pro football, a lease the Metropoli-

tan Sports Facilities Commission (as a state authority) is authorized to grant under the Sports Facilities Act, Minn.Stat.Ann. § 473.551 et seq. (West 1977 and Supp.1985).

**6.** Plaintiffs have alleged that the USFL was unlawfully denied access to Cleveland Stadium, which is operated by the Cleveland Browns (an NFL club and a party-defendant in this action), rather than by the City of Cleveland or any other local governmental authority. However, for reasons set forth infra at n. 11, the Court concludes that no evidence exists in the record to support the conclusion that defendants violated the antitrust laws by denying plaintiffs access to Cleveland Stadium.

in the practice of "franchise-dangling." Not surprisingly, the USFL argues that such behavior is overtly anticompetitive.

In each of the instances in which the decision whether or not to lease to a USFL club rested with a local governmental authority, plaintiffs' allegations of misconduct invariably turn on the involvement of one or more of the NFL defendants in the lease-approval process. Usually, such involvement was manifested by the local NFL club's presentation of its viewpoint to the appropriate city body on public issues.

Such petitioning conduct, the NFL asserts, amounts to an exercise of free speech that cannot possibly give rise to liability under the federal antitrust laws. Under the *Noerr-Pennington* doctrine,[7] "mere solicitation of governmental action through legislative processes, even though the sole purpose of the defendants is to restrain competition, is an activity which is fully protected by the First Amendment and is immune from Sherman Act liability." *Miracle Mile Associates v. City of Rochester*, 617 F.2d 18, 20 (2d Cir.1980) (citation omitted). This principle has been extended to protect petitioning conduct in proceedings before administrative agencies and the courts, *see California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972); *Miracle Mile*, 617 F.2d at 20, and quite clearly applies to the solicitation of action by state and local officials as well as by federal officials. *See, e.g., Interstate Properties v. Pyramid Co. of Utica*, 586 F.Supp. 1160 (S.D.N.Y.1984).

The USFL contends that the *Noerr-Pennington* doctrine cannot be invoked to immunize anticompetitive activity directed at government agencies acting in a purely commercial or proprietary capacity. *See*

George R. Whitten Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 33 (1st Cir.), *cert. denied*, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970); *City of Atlanta v. Asland-Warren Inc.*, 1982–1 Trade Cas. (CCH) ¶ 64,527 at 72,926–29 (N.D.Ga.1981); *see also Federal Prescription Service Inc. v. American Pharmaceutical Ass'n*, 663 F.2d 253, 263 & n. 10 (D.C.Cir.1981), *cert. denied*, 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982) (dicta). Recent decisions by federal courts of appeal, however, suggest that the *Noerr-Pennington* doctrine should not be given such a limited construction.

The Ninth Circuit, for example, has squarely held that there is no "commercial exception" to the *Noerr-Pennington* doctrine. *In re Airport Car Rental Antitrust Litigation*, 693 F.2d 84, 88 (9th Cir. 1982), *cert. denied*, 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983). In that case, the Court found that concerted lobbying efforts by two car rental companies directed at public officials who operated two state-owned airports constituted protected conduct under *Noerr-Pennington*. 693 F.2d at 88. Although the Ninth Circuit refrained from adopting an inflexible rule under which petitioning conduct aimed at government officials acting in a proprietary capacity would always be protected, the Court indicated that such conduct would be protected absent an affirmative showing that the antitrust laws should apply. *See id.*[8]

The Ninth Circuit's approach has been expressly adopted by the Fifth Circuit. *See Greenwood Utilities Comm. v. Mississippi Power Co.*, 751 F.2d 1484, 1505 & n. 14 (5th Cir.1985). Indeed, the Fifth Circuit recently held that *Noerr-Pennington* immunity could be invoked by a taxicab company which had been granted an exclusive

---

**7.** *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

**8.** It is generally recognized that the *Noerr-Pennington* doctrine serves two necessary functions: First, it preserves "the open communication be-

tween the polity and its lawmakers which is vital to the functioning of a representative democracy." *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 399, 98 S.Ct. 1123, 1129, 55 L.Ed.2d 364 (1978). Second, it protects the first amendment right to petition government for the redress of grievances. *Id.; In re Airport Car Rental*, 693 F.2d at 86.

concession at an international airport by the City of Houston. *See Independent Taxicab Drivers' Employees v. Greater Houston Transp. Co.,* 760 F.2d 607, 612–13 (5th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985). Significantly, the Fifth Circuit found that even if the record were viewed "in the light most favorable to the appellants, the most that can be said is that [appellee] secured from the City an exclusive concession whose anticompetitive effects stem primarily from a valid municipal, and vicariously state, policy." *Id.* at 613.

In the face of this recent trend towards rejecting a commercial exception to the *Noerr-Pennington* doctrine, the USFL points out, quite accurately, that the Second Circuit has yet to decide the issue. *See Triple M Roofing Corp. v. Tremco, Inc.,* 753 F.2d 242, 248 n. 4 (2d Cir.1985); *Litton Systems, Inc. v. American Tel. & Tel. Co.,* 700 F.2d 785, 805 n. 28 (2d Cir.1983), *cert.*

*denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). Nonetheless, at least Southern District Court has specifically found that *Noerr-Pennington* immunity should not be "narrowly circumscribed when the government participates in the commercial activity in question." *BusTop Shelters, Inc. v. Convenience & Safety Corp.,* 521 F.Supp. 989, 996 n. 9 (S.D.N.Y. 1981). Indeed, the Court in *BusTop* made the salient observation that *Pennington* itself "involved government purchases of coal—certainly a commercial activity." *Id.*

■■■■■ Having reviewed the relevant authority, this Court concludes that *Noerr-Pennington* may indeed be applied to immunize petitioning conduct directed at government agencies acting in a proprietary capacity, even if such conduct may be characterized as anticompetitive.[9] Thus, insofar as the *Noerr-Pennington* doctrine applies to this case,[10] plaintiffs' allegations

9. Although plaintiffs might have argued that the policies served by the *Noerr-Pennington* doctrine would not be served by protecting the particular conduct at issue in this case, the USFL has never made this specific argument. Absent an affirmative showing that the antitrust laws should apply, the Court should assume that commercial activity is not exempted from *Noerr-Pennington* protection. *See In re Airport Car Rental,* 693 F.2d at 88. Similarly, there is no reason to consider whether the "sham exception" to the *Noerr-Pennington* doctrine applies in this case, since plaintiffs have never even raised this issue *See Miracle Mile,* 617 F.2d at 21 (addressing only those instances of sham petition claimed by appellants); *see also Independent Taxicab Drivers' Employees,* 760 F.2d at 612 n. 9 (although existence of "sham-ful" conduct is generally a question of fact for the jury, plaintiffs failed to produce sufficient evidence to survive motion for summary judgment).

10. In arguing that defendants' stadium-related conduct is immune from antitrust attack, the NFL has also relied on the Local Government Antitrust Act of 1984, 15 U.S.C. §§ 34–36 (Supp. II 1984) ("LGAA") as well as the doctrine of state action immunity.

Such reliance appears misplaced. Although the LGAA bars recovery of damages under the antitrust laws "in any claim against a person based on any official action directed by a local government, or official or employee thereof acting in an official capacity," 15 U.S.C. § 36, it is questionable whether defendants were ever "di-

rected" by local governmental authorities within the meaning of the LGAA. In addition, it should be noted that the LGAA does not apply to claims for injunctive relief under the Sherman Act. *Montauk-Carribean Airways, Inc. v. Hope,* 784 F.2d 91, 95 (2d Cir.1986).

Similarly, the doctrine of state action immunity, first set forth in the Supreme Court's decision in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), does not clearly apply to the present action, in which all defendants are private parties, but in which the NFL has offered only minimal evidence to show that any of its clubs acted "pursuant to a [state's] anticompetitive regulatory program." *See Southern Motor Carriers Rate Conference v. United States,* — U.S. —, — – —, 105 S.Ct. 1721, 1730–31, 85 L.Ed.2d 36 (1985) (private party may rely on state action immunity provided it can point to the legislature's clear intent, evidenced by statute, to displace competition). In any event, it would invite confusion to evaluate defendants' stadium-related conduct under both the *Noerr-Pennington* doctrine and the state action doctrine, since these doctrines, although related, are based on analytically distinct policy considerations. *See City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 399–400, 98 S.Ct. 1123, 1129–30, 55 L.Ed.2d 364 (1978). Indeed, the independent application of the two doctrines may not always yield uniform results. *See In re Airport Car Rental,* 693 F.2d at 87 ("It would be inapt to require symmetry."); *but see Independent Taxicab Drivers' Employees,* 760 F.2d at 613 ("There is no such case as *Parker v. Noerr-Pennington.*").

of stadia interference cannot possibly give rise to liability under the federal antitrust laws.[11] Indeed, such conduct would not be illegal even if shown to be "part of a broader scheme itself violative of the Sherman Act." *Pennington*, 381 U.S. at 670, 85 S.Ct. at 1593.[12]

## B. *Evidentiary Considerations*

The possibility exists, however, that plaintiffs may attempt to introduce evidence of defendants' stadium-related conduct at trial as probative of the "purpose and character" of the transactions that are properly the subject of the jury's scrutiny. *See Pennington*, 381 U.S. at 670 n. 3, 85 S.Ct. at 1593 n. 3 (citations omitted).

Since the admissibility or exclusion of such "purpose or character" evidence will be within this Court's discretion at trial, *see id.*, it would be premature to rule on such matters at this time. Nonetheless, in anticipation of the trial in this action, a few preliminary observations are appropriate.

 The introduction of *Noerr-Pennington* evidence to illustrate the purpose or character of unprotected conduct should, at a minimum, be subject to analysis under Fed.R.Evid. 403. *See City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). In addition, since the *Noerr-Pennington* doctrine is designed to protect the exercise of First Amendment rights, "admissibility should be governed by a test that weighs the probativeness of and the plaintiff's need for the evidence against the

---

**11.** As noted earlier, *supra* at 1177, plaintiffs' allegations regarding denial of access to Cleveland Stadium are not subject to *Noerr-Pennington* analysis, since Cleveland Stadium's operations are controlled by the Cleveland Browns, an NFL club.

Plaintiffs allege that two prospective USFL franchisees, Carl Hirsch and Milton Maltz, were unlawfully denied access to Cleveland Stadium. The evidence submitted to the Court regarding Cleveland Stadium is contained in plaintiff's deposition of Arthur B. Modell (hereinafter "Modell Dep."), the principal owner of the Cleveland Browns.

In his deposition, Modell testified that he had met in his office with Hirsch and Maltz, who asked whether Cleveland Stadium would be available for use by a Cleveland USFL franchise. Modell Dep. at 77–78. Modell replied that the stadium was available, though subject to the approval of the Cleveland Indians (the major league baseball team that leases Cleveland Stadium during the spring, the same season during which the proposed USFL club would have played). *Id.* Modell also recalled some discussion of a minimum guarantee by a leasing USFL club of $100,000 a year, to be applied against a ten percent rental. *Id.* at 80.

At a subsequent meeting, Hirsch and Maltz told Modell that they had decided not to apply for a USFL franchise in Cleveland, and had chosen instead to purchase an interest in the USFL Washington Federals. Modell Dep. at 79. There is no evidence in the record, however, that Hirsch or Maltz or anyone involved with the USFL ever approached the Cleveland Indians to discuss the possibility of a USFL franchise playing in Cleveland Stadium.

Based on Modell's deposition testimony, the USFL argues that Hirsch and Maltz (and thus the USFL) were denied access to Cleveland Stadium because Modell imposed "conditions" so onerous that the prospect of leasing was effectively foreclosed. This allegation, however, is nothing more than a conclusory statement unsupported by specific facts in the record, and thus cannot be used by a party opposing summary judgment to establish the existence of a triable issue of fact. *See JSP Agency, Inc. v. American Sugar Refining Co.*, 752 F.2d 56, 59 (2d Cir.1985).

Finally, plaintiffs seek to add a conspiratorial gloss to Modell's negotiations with Hirsch and Maltz by producing evidence that Modell received legal advice on the matter from Hamilton Carothers, a member of Covington & Burling, the NFL's general counsel. Significantly, however, no evidence has been offered regarding the nature of Carothers' advice or even as to whether Modell ever applied counsel's advice. Thus, plaintiffs are essentially arguing that the consultation of a lawyer can, with nothing more, constitute anticompetitive conduct in violation of the Sherman Act. This remarkable argument must be rejected of its own weight.

In sum, there is no evidence in the record to support the conclusion that any of the defendants herein ever violated the antitrust laws (or any other laws) by denying the USFL or any of its representatives access to Cleveland Stadium for the staging of USFL games.

**12.** Thus, the general principle that "otherwise innocent or ambiguous behavior may violate the Sherman Act when considered together with the remainder of the conduct," *United States v. American Tel. & Tel. Co.*, 524 F.Supp. 1336, 1344 (D.D.C.1981) (citing Supreme Court cases), does not apply when the behavior at issue is protected by the *Noerr-Pennington* doctrine.

danger that admission of the evidence will prejudice the defendant's first amendment rights." *Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530, 543 n. 7 (5th Cir.1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979).

▇ Clearly, in seeking to introduce evidence of petitioning conduct at trial, the USFL will need to address significant evidentiary concerns.[13] For example, although a trial court is required to instruct the jury that petitioning conduct is entirely lawful, *see Pennington,* 381 U.S. at 670, 85 S.Ct. at 1593, the effect of such an instruction may be quickly eviscerated by the admission of "purpose or character" evidence clearly designed to place defendants in the harshest light. *See City of Cleveland,* 734 F.2d at 1163. Given such risks, the exclusion of "purpose and character" evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception in an antitrust case. Although Rule 403 requires that evidence should be excluded only if its probative value is "substantially outweighed" by its prejudicial effect, evidence which by its very nature chills the exercise of First Amendment rights, *see Feminist Women's Health Center,* 589 F.2d at 543 n. 7, is properly viewed as presumptively prejudicial.

In addition, lengthy presentation by the USFL of evidence of defendants' stadium-related conduct may unnecessarily confuse the issues in this case and mislead the jury. *See* Fed.R.Evid.P. 403. Although plaintiffs have gone to great rhetorical lengths to characterize defendants' stadium-related

conduct as league-inspired and concerted in nature, the admissible evidence overwhelmingly supports the conclusion that the transactions at issue were nothing more than a series of particular, local disputes in which, at worst, a single defendant sought to protect its own economic interests by petitioning the local authority in charge of stadium leases. Yet the USFL's proof as to these allegations will involve witnesses and documents largely unrelated to the action as a whole, and will focus on ancillary skirmishes between selected plaintiffs and selected defendants. *Cf. Eastside Church of Christ v. National Plan, Inc.,* 391 F.2d 357, 359 (5th Cir.), *cert. denied,* 393 U.S. 913, 89 S.Ct. 234, 21 L.Ed.2d 198 (1968) (holding that in lawsuit by twenty-two plaintiffs against twenty-seven defendants, it was appropriate to sever claims of seven plaintiffs against two particular defendants). The danger presented here is not merely one of "undue delay," Fed.R. Evid.P. 403. The danger presented is that a billion-dollar lawsuit will become dominated by a digressive element masquerading as probative evidence.

## C. *Plaintiffs' Common Law Claim*

In light of this Court's finding that the NFL's stadium-related conduct does not violate the federal antitrust laws, and given the likelihood that the USFL will, for the most part, be unable to introduce such conduct as "purpose or character" evidence at trial, defendants' alternative motion to sever plaintiffs' stadium-related "claims" has perhaps lost some of its urgency.[14]

---

**13.** Not the least of these evidentiary concerns is the overwhelmingly hearsay character of the evidence offered by the USFL to support its allegations of stadia interference, *see supra* at 1177.

**14.** In moving for summary judgment as to plaintiffs' stadium-related "claims," the NFL alternatively moved to sever the trial of such claims pursuant to Fed.R.Civ.P. 42(b), which permits a district court to order a separate trial of "any claim ... or of any separate issue" for purposes such as judicial convenience or the avoidance of prejudice. Although it has not been necessary to rule on defendants' Rule

42(b) motion, it is worth noting that the application is not without merit.

In *Reading Industries, Inc. v. Kennecott Copper Corp.,* 61 F.R.D. 662 (S.D.N.Y.1974), the Court applied Rule 42(b) to sever one of three counts in a complex antitrust lawsuit in which plaintiffs had sued defendants under the Sherman Act, the Clayton Act, and the Robinson-Patman Act. In so ruling, the Court noted certain factors to be considered in ordering a severance, including, *inter alia,* the presence of significant differences in the issues to be separately tried, and the likelihood that "the separate issues [would] require the testimony of different witnesses and documentary proof." *Id.* at 664.

Nonetheless, a related problem arises with regard to plaintiffs' pendent claim for intentional interference with prospective contractual relations. As noted earlier, Count IV of the amended complaint actually sets forth several distinct claims, one of which relates to defendants' stadium-related conduct. *See* AC ¶ 95(e). The problem is that if plaintiffs are allowed to pursue this state law claim in the present action, the door would be opened to the admission of evidence that (for reasons explained earlier) may greatly prejudice defendants with respect to plaintiffs' federal antitrust claims.

In *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court reiterated the principle that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.* at 726, 86 S.Ct. at 1139 (footnote omitted). Accordingly, when it appears that state claims may predominate in terms of proof at trial, such claims "may be dismissed without prejudice and left for resolution to state tribunals." *Id.* at 726–27, 86 S.Ct. at 1139–40. Moreover, the district court may decline to exercise pendent jurisdiction on the basis of the same non-jurisdictional considerations, such as the likelihood of jury confusion, that would justify severance of the state and federal claims under Fed.R.Civ.P. 42(b). *Id.* at 727, 86 S.Ct. at 1139.

■ The imbalance in proof that would be caused by the retention of jurisdiction over plaintiffs' pendent claim for stadia interference, along with the concomitant jury confusion, present adequate justifica-

tion for the claim's dismissal. *See Federman v. Empire Fire and Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir.1979); *cf. Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1073 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978) (dismissing pendent counterclaims dependent on proof of facts entirely irrelevant to antitrust counterclaim). Accordingly, the USFL's state law claim for stadia interference is dismissed without prejudice. *See Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139.

## II. Disparagement

The USFL alleges that part of the NFL's Section 2 violation was "a deliberate and widespread campaign launched by the defendants ... to disparage the USFL and its business prospects." AC ¶ 65. Specifically, plaintiffs allege that the NFL's "defamatory campaign has involved, among other things, the dissemination of press reports reflecting negatively on the USFL to the press and the media; and the making of disparaging and threatening remarks in an attempt to.... drive the USFL out of ... major league professional football in the United States." *Id.*[15]

As noted earlier, plaintiffs have not asserted a separate claim under the antitrust laws based on the NFL's "disparagement" of the USFL.[16] Plaintiffs do maintain, however, that the jury is entitled to consider the NFL's campaign of negative publicity as an integral part of defendants' aggregate anticompetitive conduct which, taken as a whole, violates the Sherman Act. Indeed, the USFL specifically alleges that the NFL's "deliberate and widespread cam-

---

Thus, although *Reading Industries* is dissimilar from the present action in numerous respects, the analysis applied in that case is certainly relevant to the concerns this Court has already expressed with regard to the USFL's stadium-related allegations.

15. As part of their pendent common law claims, plaintiffs assert that defendants, by means of encouraging disparaging public comment and disseminating press reports, have unlawfully interfered with the present and prospective business and contractual relations of the USFL. *See* AC ¶ 89(d)(ii) (defendants encouraged "disparaging public comments by ABC as to the USFL

quality of play and future prospects") *and* AC ¶ 95(g) (defendants "disseminate[ed] press reports that reflect negatively on the USFL to media and press around the country, to prevent or weaken public support for the USFL").

16. It is not clear whether the USFL's use of the word "disparagement" in its complaint was intended to reflect that term's narrow legal meaning, or whether the USFL was merely using the word as it is commonly used, to refer to "the expression of a low opinion of something." *Webster's Third New International Dictionary* 653 (1981).

paign" was an "unlawful means pursued by the defendants to impede competition by the plaintiffs." AC ¶ 65.

■ Although disparagement by itself will not give rise to a cause of action under the federal antitrust laws, *see Keco Industries, Inc. v. Borg-Warner Corp.*, 334 F.Supp. 1240, 1246 (M.D.Pa.1971), product disparagement coupled with the power to exclude competition may be illegal under the Sherman Act. *Power Replacements Corp. v. Air Preheater Co.*, 356 F.Supp. 872, 877 (E.D.Pa.1973); *see International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1266–68 (8th Cir.), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980). Nonetheless, the mere dissemination of unflattering opinion or information about a competitor, unaccompanied by misstatements of fact, simply does not amount to a violation of the antitrust laws. As the Second Circuit has noted in a closely related context, "Advertising that emphasizes a product's strengths and minimizes its weaknesses does not, at least unless it amounts to deception, constitute anticompetitive conduct violative of § 2." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 287– 88 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (footnote omitted); *see also Altemose Constr. Co. v. Building and Constr. Trades Council,* · 443 F.Supp. 492, 507–08 (E.D.Pa.1977) (Sherman Act counterclaim dismissed on motion for summary judgment, since challenged public statements did not contain falsity or misrepresentation).

■ In this case, no triable issue of fact exists concerning the truth or falsity of the opinion or information disseminated by the NFL about the USFL, since plaintiffs have identified no specific misrepresentation of fact made by any defendant.[17] Thus, even though the NFL may have consciously denigrated the USFL in the public forum, such a pattern of behavior, unaccompanied by false statement, does not constitute predatory or anticompetitive conduct as a matter of law.[18]

Evidence of defendants' "anti-USFL" campaign may be admissible at trial as probative of defendants' intent, or of the "purpose or character" of the NFL's anticompetitive conduct. *Cf. Pennington*, 381 U.S. at 670 n. 3, 85 S.Ct. at 1593 n. 3; *Federal Trade Comm'n v. Cement Institute*, 333 U.S. 683, 705, 68 S.Ct. 793, 805, 92

---

**17.** In denying the NFL's statement that "[p]laintiffs have identified no specific misrepresentation of fact made by any defendant," NFL Rule 3(g) Statement in Support of Motion for Summary Judgment Dismissing Disparagement Claims ¶ 3, the USFL sets forth several examples of NFL "disparagement." These examples include aggressive public relations (mailing packets of news articles containing criticism of the USFL to members of the media) to "dirty tricks" (a scheme to plant embarrassing questions at a public forum of college coaches for the purpose of discreditting the USFL). Notwithstanding plaintiffs' tireless recounting of "sharp practices" by defendants, the USFL has presented no evidence, admissible or not, of any specific misstatement of fact by defendants concerning the USFL. Clearly, defendants have at times expressed unflattering opinions about the USFL and may have even encouraged third parties to do the same. *See* Segall Affidavit in Opposition to NFL Motion for Summary Judgment on Disparagement Claims ("Segall Affidavit"), Exhibits 8 & 9 (ABC's Roone Arledge comparing the network's coverage of USFL games to its coverage of the pro bowling tour). But an unkind comparison is not a misrepresentation or a false statement.

Other evidence submitted by the USFL on the issue of disparagement is simply besides the point. For instance, the USFL has presented evidence to show that an NFL employee, in a league meeting, expressed a willingness to mislead potential pro football players about their chances of success in the NFL (in order to discourage them from signing with the USFL). *See* Segall Affidavit, Exhibits 2 & 3. Such a tactic, if carried out, might be regarded as anticompetitive; but it obviously is immaterial to the question of whether the NFL has ever made false statements *about the USFL.*

**18.** This ruling is based, in part, upon the principle that courts should not casually permit antitrust plaintiffs to attack practices such as the active solicitation of customers by product comparison, since such practices "bear a striking similarity to the way a competitive firm would ordinarily behave." *General Communications Engineering, Inc. v. Motorola Communications and Electronics, Inc.*, 421 F.Supp. 274, 287 (N.D. Cal.1976).

L.Ed. 1010 (1948). In addition, evidence regarding the anti-USFL campaign may be relevant to plaintiffs' common law claims for intentional interference with contractual relations, a species of tort that does not require proof of false statement. *See Prosser & Keeton on Torts* § 129 at 979 (5th ed. 1984).[19]

Defendants' motion for partial summary judgment as to plaintiffs' disparagement "claims" is granted to the following extent: First, plaintiffs are barred at trial from arguing that defendants have made any false statements or misrepresentations of fact about the USFL, since this Court finds that no substantial controversy exists regarding that issue. *See* Fed.R.Civ.P. 56(d). Second, whereas plaintiffs have failed to support their allegations of disparagement with any specific allegation of false statement or misrepresentation, this Court now holds that the NFL's dissemination of unflattering opinion or information about the USFL does not constitute predatory or anticompetitive conduct within the meaning of the Sherman Act.

### III. Game Officials

In its amended complaint, the USFL alleges that the nationwide market for "qualified ... game officials" is one of "several ... distinct submarkets relevant to the plaintiffs' allegations." AC ¶ 13. Plaintiffs allege that the NFL violated Section 2 by attempting to monopolize, conspiring to monopolize and actually monopolizing the market for "qualified professional football officials," AC ¶ 71(c), by refusing to permit officials employed by the NFL to officiate USFL games and by "requiring" that NFL officials observe the terms of their "full-year contracts." AC ¶ 64. Plaintiffs elsewhere allege that the NFL intentionally interfered with the USFL's prospective business and contractual relations by "foreclosing the USFL from the available pool of professional football officials by requiring NFL officials to observe full-year service contracts." AC ¶ 95(d).

### A. Factual Background

#### 1. The NFL's Officiating Program

According to the NFL's Supervisor of Officials, the NFL has used seven officials at each of its games since 1978. Affidavit of Arthur I. McNally ("McNally Aff.") ¶ 25.[20] For the past three seasons, the NFL has employed fifteen officiating crews (each comprised of seven members), as well as two standby officials, for a total of 107 officials. *Id.* ¶ 3.

Each year the NFL hires approximately six new officials to replace officials who have left the league. *Id.* ¶ 4. Nearly all of these new officials are hired from the ranks of college officials. *Id.* As a general rule, the NFL requires that new officials have at least ten years of officiating experience, five years of which have been spent officiating at the college varsity level. *Id.* ¶ 5. The NFL selects its new officials from a nationwide market, and the league has no territorial quotas or restraints in hiring. *Id.* In McNally's estimation, based on

---

**19.** The NFL has argued at some length that the USFL's allegations regarding the NFL's dissemination of unflattering information and opinion cannot state a claim for product disparagement at common law. *See* NFL Disparagement Memorandum at 16–27. Defendants are certainly correct that common law disparagement requires proof of falsity. *See, e.g., Sims v. Mack Truck Corp.,* 488 F.Supp. 592, 606 (E.D.Pa.1980) (elementary that disparagement must be false to be actionable); *National Dynamics Corp. v. Petersen Publishing Co.,* 185 F.Supp. 573, 575 (S.D.N.Y.1960) (under New York law, declaration that product is not as good as a competitor's is actionable only if statement is false). The USFL, however, has not asserted an independent claim for common law disparagement.

**20.** In order to evaluate the USFL's allegations concerning game officials in the context of the NFL's motion, it is necessary to "ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted." Fed.R.Civ.P. 56(d). Certainly the manner in which the NFL employs its game officials and the terms of those officials' contracts are material to plaintiffs' allegations. These details are set forth in the affidavit of Arthur I. McNally, who has been employed by the NFL as its Supervisor of Officials since 1968. McNally Aff. ¶ 1. Except as noted, the USFL has not challenged the substance of the McNally affidavit.

eighteen years of recruiting and hiring new officials for the NFL, there would have been approximately 1,400 to 1,500 college official in the United States who satisfied the NFL's experience requirement in 1983. *Id.* ¶ 6.

Since 1974, the NFL has used the same form of standard personal service contract for each official employed by the league. The standard contract, which provides for a one-year term of employment, also provides for a minimum salary of $5000 for each official, as well as a specified salary for each game officiated. *See id.* ¶ 14.

The contract specifies that an official's "football-related services will be furnished exclusively to the [NFL] during the term of this Agreement, unless the Commissioner, at the Official's request, authorizes him in writing to accept other such employment." McNally Aff., Exhibit A at ¶ 3(a). According to McNally, this provision is "designed to maintain the quality of NFL officiating and to protect the NFL's substantial investment in the recruiting and training of its officials." McNally Aff. ¶ 16.[21]

### 2. *NFL's Refusal to Lend its Officials*

In 1982, Carl Peterson (President of a USFL franchise then known as the Philadelphia Stars) informally asked McNally about the possibility of the USFL using the NFL's officials during the latter's off-season. McNally Aff. ¶ 22. Subsequently,

McNally discussed Peterson's request with the Commissioner of the NFL, Pete Rozelle. *Id* at ¶ 23. Eventually, the NFL decided that it would not permit its officials to work for the USFL in the spring, since the "costs" of such an arrangement would greatly outweigh its "benefits." *Id.*[22]

The USFL has characterized the NFL's justification for its prohibition on off-season employment by its officials as "absurd." USFL Memorandum in Opposition to Motions for Partial Summary Judgment at 28 n. *. In particular, the USFL assails the suggestion that the NFL felt that it could not lend the USFL its officials because spring season employment would distract the officials from the NFL's off-season training program. *Id.* In addition, plaintiffs introduced evidence that a number of NFL officials wanted to officiate for the USFL, and felt that doing so would not interfere with their duties in the NFL. *See* Deposition of Steven Ehrhart at 725–26.

Although it is undisputed that the NFL did not permit its officials to work for the USFL, there is also evidence in the record (offered by the NFL and not contradicted by the USFL) that the NFL affirmatively assisted the USFL's officiating program.[23]

### B. *The NFL's "Control" of the Market for Game Officials*

As already noted, the USFL alleges that the NFL violated Section 2 by "attempting

---

**21.** The USFL has never challenged the substance of this statement, although it has objected to the NFL's characterization of its investment in recruiting and training as "substantial." *See* USFL Rule 3(g) Statement in Opposition to Defendants' Motions for Partial Summary Judgment at 19.

**22.** According to McNally, the NFL felt that lending its officials to the USFL could have negatively affected the quality and reputation of NFL officials in several respects. First, the officials' ability to make split-second decisions in NFL games might suffer as a result of being exposed to two sets of game rules. McNally Aff. ¶ 24. Second, an official working with the six-man crew used in USFL might develop habits of field-positioning different than those developed by an official working with the seven-man NFL crew. *See id.* ¶¶ 25–26. Third, the poor performance of non-NFL officials in the USFL

might reflect badly on those NFL-trained officials working in the same crew, thereby harming the overall reputation of NFL officials. *Id.* ¶ 27.

In addition, the NFL simply did not feel that lending its officials to the USFL was a "fair" arrangement, given the NFL's investment of time and money in the recruitment and training of its officials. *See id.* ¶ 28.

**23.** In 1982, at McNally's recommendation, the USFL hired Cal Lepore, then employed as an NFL "observer," as its Supervisor of Officials. McNally Aff. ¶ 17. After Lepore had been hired by the USFL, McNally spoke with him at great length about the NFL's officiating program. *Id.* ¶ 18. In addition, the NFL has authorized the USFL to use the NFL's official game rules and officiating manual, both of which are authorized. *Id.* ¶ 19.

to monopolize, conspiring to monopolize and monopolizing the market for qualified ... professional football officials in the United States." AC ¶ 71(c). The NFL, however, contends that this allegation does not rise to the level of a triable issue of fact, since "the NFL did not in 1983, nor does it today, control any market for 'qualified game officials.'" NFL Rule 3(g) Statement in Support of Motion for Summary Judgement on Game Officials Claim ¶ 1.

Plaintiffs' response to the NFL's assertion is a disturbing exercise in *ipse dixit.* "[A]t a minimum, the USFL insists, triable issues exist as to whether there is a 'market' of major league professional football game officials for the purpose of antitrust analysis, and what control the NFL exercised in that market in 1983 and today." USFL Rule 3(g) Statement in Opposition at 18.[24] Having made such a conclusory denial, plaintiffs simply fail to satisfy a basic obligation of a party opposing summary judgment, *i.e.,* to "bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980).

■■■ The NFL's position is that a market for qualified game officials does exist, that it is nationwide, and that it may be defined as including only those individuals with ten years of experience, at least five of which have been at the college level. Quite significantly, the USFL's own complaint is consistent with the NFL's position as to the existence of a market for qualified game officials, and as to that market's geographic definition. *See* AC ¶ 71(c). Nonetheless, by referring to a product market of "major league professional football officials," USFL Rule 3(g) Statement in Opposition at 18, plaintiffs apparently seek to argue that the market in issue consists *only* of game officials with pro football experience.[25]

For purposes of the present motion, this argument is untenable for at least two reasons. First, plaintiffs' proposed market definition is unsupported by any "specific facts or evidentiary data," or by any of "the sort of concrete particulars which [Rule 56] require[s]." *Dressler v. MV Sandpiper,* 331 F.2d 130, 133 (2d Cir.1964). Second, the NFL's definition of the qualified game officials market is demonstrably consistent with the manner in which both the NFL and the USFL have, in practice, defined this particular market. It is uncontested that the NFL regards an official with five years of college experience and ten years of overall experience to be qualified. As for the USFL, the league's own supervisor of officials has testified that, based on the NFL's practice, the USFL adopted the five-and-ten standard as its own hiring criteria. *See* Deposition of Leonard Cal Lepore ("Lepore Dep.") at 27. Thus, the evidentiary record in this case lends crucial support to the NFL's market definition. It is well-settled that the definition of a relevant product market "turns on discovering patterns of trade which are followed in practice." *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 303 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954); *see, e.g., SmithKline Corp. v. Eli Lilly & Co.,* 427 F.Supp. 1089, 1118 (E.D.Pa.1976), *aff'd,* 575 F.2d 1056 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978) (relevant product market defined by reference to current consumer-physician

---

**24.** The USFL rationalizes its token opposition to this part of the NFL's Rule 3(g) statement by denying that plaintiffs have separately alleged that the NFL controls any market for "qualified game officials." *See* USFL Rule 3(g) Statement in Opposition at 18. Yet even a cursory review of the amended complaint reveals the inaccuracy of such a statement. *See* AC ¶ 71(c). Although this Court has already determined that the USFL has not asserted a distinct *claim* for the monopolization of the game official market,

it is quite obvious that the plaintiffs' complaint contains *allegations* to that effect.

**25.** If such a market definition were accepted, it would lead inexorably to the conclusion that the NFL, as the only professional football league in existence immediately prior to the USFL's formation, possessed monopoly power in the qualified game officials market.

practices); *see generally ABA Antitrust Section, Antitrust Law Developments* 110 (2d ed. 1984).

Ultimately, the proposition that the market for qualified game officials in professional football leagues should be defined as including college-level officials is little more than a straightforward application of the "reasonable interchangeability" test. *See United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). In moving for summary judgment, the NFL has carried its preliminary burden by supporting its proposed market definition with probative, admissible evidence adduced from persons with personal knowledge of the facts. *See United States v. Pent-R-Books, Inc.*, 538 F.2d 519, 529 (2d Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977). In response, however, the USFL has failed to produce significant probative evidence tending to support of its own position. *See id.* Accordingly, this Court has no difficulty in adopting the NFL's definition of the qualified game officials market for purposes of this motion, since no "substantial controversy" exists with regard to that definition. *See* Fed.R.Civ.P. 56(d).

 Once the market of qualified game officials has been defined as including those officials who satisfy the five-and-ten criteria used by both the NFL and the USFL, it becomes clear that the NFL is entitled to summary judgment on the issue of market power. If, for example, the number of qualified game officials available for the 1983 season is conservatively estimated at 1,000,[26] then the NFL's 107-person cadre of officials amounts to only slightly more than 10% of the available supply. Since a market share below 50% will rarely evince monopoly power, *see, e.g., Broadway Delivery Corp. v. United Parcel Service*, 651 F.2d 122, 129 (2d Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981), this Court should not

hesitate to find that the NFL's "share" of the available supply of qualified game officials is insufficient, as a matter of law, to constitute monopoly power. *See also United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir.1945) (although 90% of supply "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not.").

Perhaps more significant than the NFL's lack of monopoly power as to qualified game officials is the dearth of evidence in the record to support plaintiffs' argument that defendants' refusal to lend NFL officials to the USFL constitutes anticompetitive or predatory conduct in violation of the federal antitrust laws.

Analytically, the contractual restriction at issue could be treated either as a covenant not to compete or as a refusal to deal. Covenants not to compete, in the antitrust context, are generally subject to a rule of reason analysis. *See, e.g., Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1082 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978). Applying such an analysis, the Second Circuit found that a ten-year post-employment covenant not to compete served a brokerage firm's legitimate business interests and did not contain restrictions so burdensome that its anticompetitive purposes and effects outweighed its justifications. *See* 563 F.2d at 1082–83. According to the Seventh Circuit, a covenant not to compete will survive antitrust scrutiny if found to be (1) ancillary to a lawful contract's main business purpose; and (2) limited to those restrictions necessary to protect the legitimate business interests of the covenantee. *See Lektro-Vend*, 660 F.2d at 265 (citing *United States v. Addyston Pipe & Steel*

---

**26.** McNally has estimated that, in 1983, there were over 1,400 college officials throughout the United States who satisfied the five-and-ten standard. *See* McNally Aff. ¶ 6. The USFL has never challenged this estimate, and its own su-

pervisor of officials has testified that he received somewhere between 1,000 to 2,000 applications for 39 open positions in 1983. *See* Lepore Dep. at 131.

Co., 85 F. 271, 281–82 (6th Cir.1898), aff'd as modified, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 [1899] ).

Applying the relevant case law to the NFL's prohibition of off-season officiating, it is not readily apparent how such a restriction, though obviously a restraint of trade in the literal sense, could possibly violate the antitrust laws. The restriction at issue is only one year in duration, and does not even extend to non-football officiating. See McNally Aff., Exhibit A, ¶ 3(a). Furthermore, although the USFL challenges the scope of the business interests served by the NFL's off-season prohibition, plaintiffs do not seriously challenge the existence of such interests. Finally, the covenant not to compete at issue in the present case relates to the ability of the NFL's game officials to seek football-related employment during the term of their employment. It strains credulity to suggest that the antitrust laws should be construed so as to punish a business for requiring its employees to remain loyal to their employer while they remain employed.

If, alternatively, the prohibition of off-season employment by NFL game officials is treated as a refusal to deal, the conclusion that the prohibition does not violate the antitrust laws is still ineluctable. Although a monopolist's refusal to deal with others in the chain of distribution can give rise to liability under Section 2, see, e.g., Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1926), such cases commonly involve a plaintiff's inability to acquire the monopolist's product or resources absent cooperation by the monopolist. The analysis is quite different, however, when the plaintiff cannot reasonably contend that the monopolist's conduct has cut him from all sources of supply. See Fairdale Farms, Inc. v. Yankee Milk, Inc., 715 F.2d 30, 33–34 (2d Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 174 (1984) (refusal of dairy farm cooperative to sell to dairy products producer with other available sources of supply cannot be considered an "unlawful use of lawfully required monopoly power"). In the instant case, the USFL's access to other available sources of supply in the qualified game officials market has been established beyond genuine dispute by the NFL. Under Fairdale Farms, the infirmity of a Section 2 claim based on the NFL's decision not to lend its officials to the USFL is apparent.

Moreover, the USFL's access to alternative sources of supply appears to preclude the possibility that plaintiffs could have successfully asserted a Section 1 claim against the NFL based on defendants' refusal to lend their officials to the USFL. Indeed, it is hard to imagine how, given the USFL's broad access to qualified officials in the college ranks, the NFL's decision not to share its officials could possibly be characterized as having a substantial anticompetitive effect.[27]

---

27. Assuming that a rule of reason analysis applies to the NFL's "refusal to lend," the appropriate inquiry is whether the restraint at issue is one that promotes competition or one that suppresses competition. See National Society of Professional Engineers v. United States, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). In forming a judgment about the competitive significance of a given restraint, the court must analyze "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." Id. at 692, 98 S.Ct. at 1365.

Although defendants have offered several business reasons for refusing to lend its officials to the USFL, perhaps their most basic explanation has been that they simply did not regard such an arrangement to be "fair," given the NFL's investment of time and money in the recruitment and training of its officials. See McNally Aff. ¶ 28. In other words, the NFL did not feel obligated to accomodate the USFL in the latter's capacity as a "free-rider." Significantly, the NFL's position does not appear inconsistent with the law of this Circuit. See Konik v. Champlain Valley Physicians Hosp. Med'l Center, 733 F.2d 1007, 1014 (2d Cir.), cert. denied, —— U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984) (antitrust analysis takes into account that some arrangements may be necessary to remedy market imperfections such as the "free rider" effect) (citation omitted); see also Berkey Photo, 603 F.2d at 281 ("If a firm that has engaged in the risks and expenses of research and development were required in all circum-

■ In short, the NFL's refusal to permit its officials from working for the USFL during the NFL's off-season did not constitute conduct independently violative of the antitrust laws. At the same time, the USFL's contention that the NFL's conduct with regard to game officials is probative of the NFL's aggregate anticompetitive conduct, *see* AC ¶ 64, raises issues beyond the scope of the present motion.[28]

### C. *Plaintiffs' Common Law Claim for Contractual Interference*

Plaintiffs' common law claim regarding the NFL's refusal to lend the USFL its officials essentially states a claim for intentional interference with prospective advantage. *See generally Prosser & Keeton on Torts* § 130 (5th ed. 1984). Under New York law,[29] the species of tort that governs such a claim is interference with advantageous business relations. *See Nifty Foods Corp. v. Great Atlantic & Pacific Co.*, 614 F.2d 832, 838 (2d Cir.1980). In *Nifty Foods*, the Second Circuit found that a cause of action for contractual interference with advantageous business relations "requires proof that the defendants' sole motive was to inflict injury and that the defendant employed unlawful means to do so." *Id.*

> stances to share with its rivals the benefits of those endeavors, this incentive would very likely be vitiated.").
> In this lawsuit, the USFL has alleged certain acts and practices which, if proven, may well require a finding that the NFL has violated the antitrust laws. The so-called game officials claim, however, is not of such caliber.

**28.** The USFL has cited the Supreme Court's recent decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, — U.S. ——, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) for the proposition that "[t]he absence of an unqualified duty to cooperate does not mean that every time a firm declines to participate in a particular cooperative venture, that decision may not have *evidentiary significance*, or that it may not give rise to liability under certain circumstances." *Id.* —— U.S. at ——, 105 S.Ct. at 2856 (emphasis added). The appropriate time for the USFL to test the "evidentiary significance" language of *Aspen Skiing* by offering evidence related to game offi-

■ Even if all factual ambiguities and inferences are drawn in plaintiffs' favor, *see PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d at 123, the USFL cannot withstand summary judgment on its common law game officials claim. First, plaintiffs have failed to articulate any sound legal theory under which the NFL's refusal to lend the USFL its officials could possibly be termed unlawful.[30] Second, the undisputed facts related to game officials are wholly inconsistent with any finding that the NFL's "*sole* motive was to inflict injury." *Id.* (emphasis added). This conclusion follows inescapably from defendants' evidence (challenged by plaintiffs as to significance but not as to substance) that the NFL was at least partly motivated by its own business interests in choosing not to lend its officials to the USFL. In addition, the uncontested evidence that the NFL actually assisted the USFL in establishing its officiating program is hardly evidence of an unadulterated intent to inflict injury upon a competitor.

Accordingly, the NFL's motion for summary judgment with respect to the USFL's common law game officials claim is granted, and the claim is dismissed.

### IV. CONCLUSION

The NFL's motions for partial summary judgment are granted in the following re-

cials will be at trial, subject to defendants' possible objections on grounds, *inter alia*, of relevance and undue prejudice. *See* Fed.R.Evid. 402, 403.

**29.** With respect to plaintiffs' common law claims, the parties have consistently relied on New York case law. Under these circumstances, there is no need to challenge the parties' conviction that New York law applies. *See Lehman v. Dow Jones & Co.*, 783 F.2d 285, 294 (2d Cir.1986).

**30.** The application of the federal antitrust laws to plaintiffs' allegations regarding game officials has already been discussed. In addition, although the parties have not briefed the issue, it seems beyond doubt that a one-year covenant not to compete *during the employee's term of employment* would withstand scrutiny under common law. *Cf. Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 353 N.E.2d 590, 386 N.Y.S.2d 677 (1976).

spects: First, defendants' efforts to secure advantageous stadium leases from local governmental authorities, as well as any efforts to convince such authorities not to grant stadium leases to USFL clubs, are found, as a matter of law, to constitute privileged conduct incapable of violating the Sherman Act. Second, the Court finds that plaintiffs' myriad allegations of "disparagement" of the USFL by the NFL do not include specific allegations of falsity or misstatement of fact. Therefore, no triable issue of fact exists with regard to that issue. Third, the Court finds, as a matter of law, that the NFL did not in 1983, and does not today, possess monopoly power in the market for qualified game officials. Fourth, defendants are granted summary judgment as to plaintiffs' common law game officials claim, and that claim is now dismissed.

In addition, plaintiffs' pendent claim for stadia interference is dismissed without prejudice. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966).

SO ORDERED.